**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHER DISTRICT OF CALIFORNIA**

| | |
|---|---|
| AVIVA KELLMAN, JASON FRY, NICHOLAS NEWELL, SUSAN GLEDHILL STEPHENS, and WILLIAM WILLIAMS, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>SPOKEO, INC.<br><br>Defendant. | Case No. 21-cv-08976-WHO |

**DECLARATION OF ANYA VERKHOVSKAYA**

**May 22, 2025**

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................. 3

II.     SUMMARY OF OPINION ................................................................................. 4

III.    EXPERIENCE AND QUALIFICATIONS ....................................................... 4

IV.     DATA AND DOCUMENTS RELIED ON ......................................................... 8

V.      SOURCE DATA STANDARDIZATION ....................................................... 12

VI.     OVERVIEW OF ANALYSIS ........................................................................... 15

VII.    DESCRIPTION OF ANALYSIS ..................................................................... 16

1.      STEP 1: State-Based Filtering ........................................................................ 16

2.      STEP 2: Data Enrichment ............................................................................... 17

3.      STEP 3: Random Statistical Sample Selection .............................................. 18

4.      STEP 4: Historical Reverse Telephone Append ............................................. 18

5.      STEP 5: Name Matching ................................................................................. 22

6.      STEP 6: Address Matching ............................................................................. 24

7.      STEP 7: Dual-Match Identification ................................................................ 25

8.      STEP 8: Independent Verification by USPS National Change of Address .... 26

9.      STEP 9: Delivery Sequence File Second Generation (DSF2®) Residential  Classification 28

10.     STEP 10: Statistical Projection to the Full Class Universe ........................... 29

11.     STEP 11: Allocation of Validated Records to the California and Ohio Classes ............ 30

12.     STEP 12: Application of the Full Methodology to Two Class Representatives ............. 31

VIII.   CONCLUSION ................................................................................................. 32

I, Anya Verkhovskaya, hereby state as follows:

## I.    INTRODUCTION

1.    I am President & Chief Executive Officer of Class Experts Group, LLC (CEG), a firm that offers litigation support services, including as consulting or testifying experts, with a focus on class member name and address identification, class notice, claims adjudication and fund distribution, as well as class action data analysis in data privacy, consumer protection, civil rights, and other class action litigation. CEG's brochure is attached as Exhibit 1. My resume describes my experience and qualifications in more detail and is attached as Exhibit 2.

2.    Plaintiffs' counsel asked me to apply my decades of experience in the fields of data analysis, class member identification and location in class action litigation, to analyze Spokeo's discovery and data produced in the above-captioned matter.

3.    I understand that Plaintiffs allege that Spokeo, Inc. has violated and continues to violate their statutory rights of publicity as well as their common law rights concerning the misappropriation of their names and likenesses through the unauthorized commercial use of their personal information.

4.    It is my understanding that the Court has certified the following Rule 23(b)(3) classes (the "Classes"):

> **California Viewed-Prior-to-Purchase Class**
>
> All California residents who are not registered users of Spokeo.com and whose teaser profile was viewed by a user immediately prior to purchasing a Spokeo.com subscription on or after November 19, 2019, where such teaser profile includes a name and home address.
>
> **Ohio Viewed-Prior-to-Purchase Class**
>
> All Ohio residents who are not registered users of Spokeo.com and whose teaser profile was viewed by a user immediately prior to purchasing a Spokeo.com subscription on or after November 19, 2017, where such teaser profile includes the individual's name and home address.

5.    Plaintiffs' counsel asked me to opine on certain issues raised in this litigation related to whether Spokeo teaser profiles for individuals in the certified Classes reasonably identify

the class member. This includes whether the teaser profile includes an identifiable name/address and whether the address is a residential address.

6.      I did not receive or review any file until I had properly executed Schedule A to the Stipulated Protective Order.

7.      I directed, reviewed, and am responsible for the analysis that forms the basis of my opinions. Some aspects of this analysis were executed by my staff working under my supervision and at my direction.

8.      Plaintiffs retained me at an hourly rate of $625 for data analysis and preparing this Declaration, and $850 for testimony in deposition, at a hearing, or in trial. My staff performs work at rates ranging between $90 and $525 per hour. My compensation does not depend upon the opinions that I offer or on the outcome of this matter.

9.      I have testified as an expert witness at deposition or trial in the last four years in the cases listed on Exhibit 3.

## II.      SUMMARY OF OPINION

10.      <u>OPINION</u>: Using the data provided by Defendant, there is a reliable and efficient method by which it can be determined whether relevant Class teaser profiles included an identifiable name and an associated residential address.

## III.      EXPERIENCE AND QUALIFICATIONS

11.      I have more than 20 years' experience in identifying and locating class members to administer class action and related programs, involving all aspects of email, direct media, digital, and third-party notice.

12.      I have analyzed, overseen, and directed data analysis, and made determinations regarding data containing billions of records, including but not limited to analysis of names and addresses, telephone call records; and various other large-volume data sets.

13.      I am familiar with numerous and diverse methods and systems that are commonly used to perform reliable record analysis on voluminous data, including, but not limited to loading, standardizing, transforming, querying, and cross-referencing.

14.     I have substantial experience, both as a class action settlement and notice administrator and as an expert, utilizing data processors' information to locate, identify and confirm names and addresses of class members. I have completed similar processes in *Samson v. United Healthcare*, *Brown v. DirecTV*, *Buchanan v. SiriusXM*, *Krakauer v. Dish Network*, *McMillion v. Rash Curtis & Assoc.* I have also done this in hundreds of cases with tens of millions of names and addresses for class members including but not limited to:

   a.  *Desai v. ADT Security Systems, Inc.*, No. 11-1925 (N.D. Ill.)

   b.  *Fitzgerald v. Universal Pictures*, No. 16-cv-01193 (M.D. Fla.)

   c.  *Flowers v. Twilio, Inc.*, No. RG16804363 (Cal. Super. Ct.)

   d.  *Fray-Witzer v. Metro. Antiques, LLC*, No. 02-5827 (Mass. Super. Ct.)

   e.  *Heidarpour v. Central Payment Co. LLC*, No 15-cv-139 (M.D. Ga.)

   f.  *Ikuseghan v. Multicare Health System*, No. 14-5539 (W.D. Wash.)

   g.  *Lofton v. Verizon Wireless LLC*, No. 13-cv-05665 (N.D. Cal.)

   h.  *Mann & Co. v. C-Tech Industries, Inc.*, No 08-11312 (D. Mass.)

   i.  *Mey v. Frontier Commc'ns Corp.*, No 13-cv-1191 (D. Conn.)

   j.  *Mey v. Herbalife Int'l, Inc.*, No. 01-c-263 (W.V. Cir. Ct.)

   k.  *Mey v. Venture Data, LLC*, No. 14-123 (N.D. W.Va.)

15.     I have overseen administration, processing, and adjudication of millions of class action claims.  This includes analysis, classification, processing paper and digital documents, and related correspondence; issuance of payment; and assuring legal and tax settlement fund compliance.

16.     I regularly serve as an expert witness, providing opinion testimony in state and federal cases related to class member identification and location, notice adequacy, claims administration, and settlement disbursal.

17.     In each case, I employed a reliable method using best practices to identify and locate persons who met the class definition, without recourse to individualized review.

18.     These cases involved identification, notification, and issuing payment to millions of class members.

19.     Many of the cases listed above involved classes of persons for whom the defendants did not have name/address/email information. I used best practices to identify class members' missing contact information and to ensure payment to settlement class members with valid claim forms.

20.     Courts have admitted my expert opinions testimony about data analysis methods, notice programs' effectiveness, and reliability of claims administration determinations, in dozens of cases.

21.     I have also overseen a number of international administration programs.

22.     As the notice administrator in the *In re Holocaust Victim Assets Litig.*, 105 F. Supp. 2d 139 (E.D.N.Y. 2000), I played a key role in a worldwide Phase I notice program that resulted in processing over 500,000 questionnaires relating to a $1.25 billion settlement. In Phase III of that matter, I coordinated delivering notice to more than 10,000 Jewish communities in 109 countries. In both Phases I and III, I administered international help and call centers that assisted more than 100,000 potential claimants, created a class notice targeting members of the Romani community in 48 countries, directed hundreds of staff in communicating with Romani communities and individuals, and notified more than two million people.

23.     I was appointed by the German government to lead notice and claims collection in the German Forced Labour Compensation Programme (GFLCP). Under my direction, the program located more than 43,000 Romani survivors in 17 countries who were potentially eligible for humanitarian aid. I oversaw creation of a comprehensive database for the GFLCP and the Holocaust Victim Assets Programme and coordinated assistance with claim completion for more than 11,000 Romanies in eight central countries.

24.     I was appointed by Chairman Lawrence Eagleburger to serve as consultant to the International Commission on Holocaust Era Insurance Claims (ICHEIC) on notice and outreach strategies and supervised the notification of claimants and assistance programs.

25.     I was appointed by the Israeli government as the administrative director of Project HEART (Holocaust Era Asset Restitution Taskforce) to enable Israel and its partners to secure

restitution for Holocaust survivors. I assisted in launching a multilingual, interactive website, establishing a 24-hour call center in 13 languages, distributing more than 500,000 documents to potentially eligible families of Holocaust victims, handling more than 80,000 telephone calls, conducting archival research, and creating the most comprehensive online database of nearly two million records of looted Jewish property. In addition, under my supervision, Project HEART reached out to 15,000 non-governmental organizations to help assist to thousands of Holocaust victims and their heirs in making their claims.

26. I was appointed as Settlement Administrator in *Leslie Ann Wilkie Peltier, et al. v. Deb Haaland, et al.*, No. 20-cv-03775 (D. D.C.), a class action to redress breaches of trust by the United States Department of the Interior, the United States Department of the Treasury, and the United States of America with respect to Judgment Awards of the Indian Claims Commission (ICC). The $59 million settlement provides relief to several generations of tribal families. I developed a class notification and claims adjudication process that would efficiently distribute settlement funds to surviving tribal members and their heirs, many of whom are aging. At the preliminary approval hearing, the federal judge overseeing the settlement noted that CEG was "instrumental in helping to shape the deal…"

27. At the final settlement approval fairness hearing, class counsel noted that CEG "made extensive efforts to identify and reach" the class and that CEG's class notification efforts "have met or gone beyond the Rule 23 and due process…requirements…The notice program here has been thorough…" In his final approval order, the court noted that CEG's class notification process provided "the best notice practicable under the circumstances…and it was reasonably calculated to reach the class members."

28. Claims were filed by class members from the United States and ten additional countries.

## IV.    DATA AND DOCUMENTS RELIED ON

29.    My opinions here are based on the data and information available to me as of today. I reserve the right to supplement or amend this Declaration should new data or information be provided by Defendant and/or agents acting on its behalf.

█    It is my understanding, based upon the declaration of Michael Daly, that "teaser profiles" displayed on the Spokeo website are ████████████████████████████ ████████████████████████████████████████████████████

31.    In the course of my work on this matter, my team and I have reviewed a variety of materials relevant to this case. I relied on the following files and documents in forming my opinions outlined in this Declaration. I will further refer to files a. through aa. as the "Source Data."

██████████

      a.    Kellman_00011909 - ████████1 (E converted).csv;[1]

<u>ADDITIONAL SOURCE DATA</u>

      b.    (11.18.2024) - HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY.xlsx;

      c.    51 missing names - HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY.xlsx;

      d.    Part 2 (11.25) with names.xlsx;[2]

      e.    Kellman_00012243.csv;

      f.    Kellman_00012244.CSV;[3]   which based upon the Daly Declaration I understand to be a file of ████████████████████████████ ████████████████████████;

      g.    Kellman_00012245.CSV;[4]   which based upon the Daly Declaration I understand to be a file of ████████████████████████████

---

[1] I received but did not utilize files "Kellman_00011909.CSV" which is duplicative of this file.
[2] I received but did not utilize files "part 2 (11.19.2024) - HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY.xlsx" and "part 2 with ████ (11.20.2024) - HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY.xlsx" which are duplicative of this file.
[3] I received but did not utilize file "Kellman_00012308.CSV" which is duplicative of this file.
[4] I received but did not utilize file "Kellman_00012309.CSV" which is duplicative of this file.

██████████████████████

h.  Kellman_00012248_Part1.csv; which based upon the Daly Declaration I understand to be a file of ██████████████████████

i.  Kellman_00012248_Part2.csv; which based upon the Daly Declaration I understand to be a file of █████████████████;

j.  Kellman_00012249.csv;[5]

k.  Kellman_00012250.csv;[6]

l.  Kellman_00012253.CSV;[7]

m.  Kellman_00012254.CSV;[8]

n.  Kellman_00012255.CSV;[9]

o.  Kellman_00012293.CSV;

p.  Kellman_00012296.CSV;[10]

q.  Kellman_00012300.CSV;[11]

r.  Kellman_00012302.CSV, which based upon the Daly Declaration I understand to be a █████████████████████████████ ██████

s.  Kellman_00012303.CSV, which based upon the Daly Declaration I understand to be ████████████████████████

t.  Kellman_00012304.CSV;[12]

u.  Kellman_00012306_Part1.csv;

v.  Kellman_00012306_Part2.csv;

w.  Kellman_00012307.CSV;[13]

---

[5] I received but did not utilize file "Kellman_00012298.CSV" which is duplicative of this file.
[6] I received but did not utilize file "Kellman_00012297.CSV" which is duplicative of this file.
[7] I received but did not utilize file "Kellman_00012294.CSV" which is duplicative of this file.
[8] I received but did not utilize file "Kellman_00012295.CSV" which is duplicative of this file.
[9] I received but did not utilize file "Kellman_00012292.CSV" which is duplicative of this file.
[10] I received but did not utilize files "Kellman_00012246.CSV" and "Kellman_00012247.CSV" which are duplicative of this file.
[11] I received but did not utilize file "Kellman_00012305.CSV" which is duplicative of this file.
[12] I received but did not utilize file "Kellman_00012242.CSV" which is duplicative of this file.
[13] I received but did not utilize file "Kellman_00012310.CSV" and "Kellman_00012241.CSV" which are duplicative of this file.

  x. Kellman_00012314.CSV; which based upon the Daly Declaration I understand to be a file containing ███████████████████████████████ ████████████

  y. Kellman_00012315.CSV;

  z. Kellman_00012311.txt;[14]

  aa. Kellman_00012312.txt;[15]

all preceding files together, collectively further referenced as the "Source Data".

<u>DATA FILES RECEIVED, REVIEWED, BUT NOT RELIED ON</u>

  bb. Kellman_00011909.csv;

  cc. Kellman_00012241.csv;

  dd. Kellman_00012242.csv;

  ee. Kellman_00012243.csv;

  ff. Kellman_00012246.csv;

  gg. Kellman_00012251.csv;

  hh. Kellman_00012252.csv;

  ii. Kellman_00012257.csv;

  jj. Kellman_00012291.csv;

  kk. Kellman_00012292.csv;

  ll. Kellman_00012294.csv;

  mm. Kellman_00012295.csv;

  nn. Kellman_00012297.csv;

  oo. Kellman_00012298.csv;

  pp. Kellman_00012299.csv;

  qq. Kellman_00012301.CSV;

  rr. Kellman_00012305.CSV;

---

[14] I received but did not utilize file "Kellman_0012311.json" which is duplicative of this file.
[15] I received but did not utilize file "Kellman_00012312.json" which is duplicative of this file.

ss.  Kellman_00012311.json;

tt.  Kellman_00012312.json;

uu. Kellman_00012313.csv;

vv. Kellman_00012313.txt;

ww.    Kellman_00012313.XLSX;

xx. Kellman_00012316.pdf; and

yy. Kellman_00012317.pdf.

<u>DOCUMENTS</u>

zz. May 26, 2022, Stipulated Protective Order;

aaa.    July 24, 2023, Plaintiff Susan Gledhill Stephens's Supplemental Answers and Objections to Defendant Spokeo, Inc.'s First Set of Interrogatories (the "Stephens Responses");

bbb.    December 22, 2023, Plaintiff William Williams's Amended Answers and Objections to Defendant Spokeo, Inc.'s First Set of Interrogatories (the "Williams Responses");

ccc.    January 26, 2024, Declaration of David Alfaro ISO Defendant Spokeo, Inc.'s Opposition to Class Certification and Motions to Exclude the Declarations and Testimony of Michael Naaman and Steven Weisbrot;

ddd.    May 29, 2024, Order Regarding Class Certification;

eee.    November 6, 2024, Joint Stipulation Regarding Class Definition;

fff. November 13, 2024, Further Joint Stipulation Regarding Ohio Viewed-Prior-To-Purchase Class Definition;

ggg.    February 21, 2025, Transcript of Virtual Videoconference Video-Recorded Deposition of Spokeo, Inc. by and through its Corporate Representative Michael Daly, Friday, and its exhibits (the "Daly Deposition Transcript" or "Daly Deposition");

hhh.    March 7, 2025, Plaintiffs' Second Supplemental Rule 26(a)(1) Initial Disclosures;

iii.    March 21, 2025, Declaration of Mike Daly Provided Pursuant to March 6, 2025, Stipulation;

jjj.    April 11, 2025, Declaration of Mike Daly ISO Spokeo's Administrative Motion to File Documents Under Seal and its exhibits (the "April 2025 Daly Declaration" or "Daly Declaration"); and

kkk.    April 11, 2025, Defendant Spokeo, Inc.'s Motion for Summary Judgment.

## V. SOURCE DATA STANDARDIZATION

32.    Beginning about March 12, 2025, I received Source Data. I understand that the Source Data consists of discovery records and data produced in this litigation by the Defendant.

33.    In over two decades of experience in class action data analysis, I have developed a method to identify records that have certain characteristics, such as geographic flags, inclusion flags, name and address completeness flags, etc. This method has been validated repeatedly and has been accepted into evidence in a number of federal and state lawsuits where I reviewed and analyzed data.

34.    In this section, I describe the method I used to prepare the data produced in this litigation for further analysis.

35.    Over the years, I have processed many types of data from various sources and in different formats. Part of this experience includes cross-comparisons of records and files from different sources.

36.    Here, I completed a process of data mapping, standardization, and hygiene to organize the data for efficient substantive analysis.

37.    I loaded the relevant data points from the Source Data records into .SQL staging tables. Structured Query Language (or ".SQL," commonly called "Sequel") is a programming language used to communicate with relational databases of tables. Sequel allows a user to retrieve

or update data on a database. Sequel is commonly used across many industries to reliably and efficiently analyze mass data sets.

38.    For each file that I loaded into an .SQL staging table, I documented, through a data receipting spreadsheet attached as Exhibit 4 to this Declaration (the "Data Receipting Document, Overview Worksheet"), the number of records per file to ensure that the data load was executed correctly.

39.    Loading raw data to a Sequel staging table enables queries to run across a large volume of data.

40.    I have overseen the writing and execution of Sequel commands and queries for more than 20 years. Almost every expert opinion I have offered involves overseeing the development and implementation of Sequel commands and queries across various types of data.

41.    Here, I translated the information in the Source Data records into common fields. This process is "data mapping." It is useful because records produced in litigation are often produced in different formats using different data field sequences and column headers. A copy of the data mapping document is attached to this Declaration as Exhibit 5 (the "Data Mapping Document"). The Data Mapping Document includes a comprehensive overview of the data fields within the Source Data files.

42.    The data fields that are particularly relevant are described in Table 1 below. I will refer to these fields using the terminology from the column "Data Field, as Mapped."

Table 1

| Data Field, as Mapped | Field Description | Additional Notes |
|---|---|---|
| ██ | ████████████████████ | |
| Full Name(s) | Name ████████ | Multiple unique names ████, if present, were loaded to the database. Duplicates were deduplicated. |
| Address(es) | Street address ████████ | |
| City(s) | City ████████ | Multiple unique addresses ████, if present, were loaded to the database as ████████ |
| State(s) | State ████████ | |
| Zip(s) | Zip code ████████ | ████. Exact duplicates were deduplicated. |

| Purchase Date(s) | ███████████████████████<br>███████████████<br>████████████████<br>████████████ | Multiple unique purchase dates ██████ were loaded to the database. Duplicates were deduplicated. |
|---|---|---|
| Telephone Number(s) | Telephone number ████████████<br>█████ | Multiple unique telephone numbers ██████ were loaded to the database. Duplicates were deduplicated. |

43.    The Source Data records were then loaded into a Sequel master table after data hygiene and standardization. The steps I took in this data standardization and hygiene process were: (a.) standardizing the format of dates; and (b.) removing errant and unnecessary characters, such as brackets, etc., where necessary.

44.    Following the data standardization, loading and deduplication, the following statistics were applicable:

Table 2

| █████[16] | 652,265 |
|---|---|
| Full Names[17] | 1,053,027 |
| Full Addresses[18] | 990,101 |
| Telephone Numbers | 477,829 |
| Email Addresses[19] | 483,269 |

otherwise further referred to as the "Standardized ████" "Standardized Full Names," "Standardize Full Addresses," "Standardized Telephone Numbers," and the "Standardized Email Addresses," respectively; collectively, "Standardized Records."

---

[16] ████ were standardized by removing a leading "█" and all final characters following "?" character, where in existence.
[17] A name that consists of more than one word.
[18] An address that has at least "Street 1," "City," and "State" fields.
[19] All values without the "@" character were removed.

*Kellman, et al. v. Spokeo, Inc.*                                                           Page 14 of 33
Declaration of Anya Verkhovskaya

## VI.     OVERVIEW OF ANALYSIS

45.     I took the following steps to form my opinions:

1.  **State-Based Filtering** – I limited the ███████████ whose State field contained "California," "CA," "Ohio," or "OH."

2.  **Data Enrichment** – For every ████ that remained, I appended (a) its Standardized Full Name from the ██████, (b) all unique California or Ohio Standardized Full Addresses ███████████████ in the Source Data, and (c) all Standardized Telephone Numbers ████████████

3.  **Random Statistical Sample Selection** – From the Step 2 population, I drew a statistically significant random sample.

4.  **Historical Reverse Telephone Append** – For each telephone number in the Step 3 sample, I obtained historical reverse-append data—specifically, associated names ("Reverse Append Names") and addresses ("Reverse Append Addresses").

5.  **Name Comparison** – I compared every Standardized Full Name from the ████ ███ to the corresponding Reverse Append Name to flag exact or fuzzy-logic matches.

6.  **Address Comparison** – I compared every Standardized Full Address from the Source Data to the corresponding Reverse Append Address, again flagging matches.

7.  **Dual-Match Identification** – I retained only ████ that exhibited both a match between Standardized Full Name and Reverse Append Name and a match between Standardized Full Address and Reverse Append Address for that same reverse append data.

8.  **NCOA Verification for Non-Matches** - For ████ that failed to satisfy both criteria in Step 7, I ran every possible name–address permutation through the USPS ® National Change of Address (NCOA) database to determine whether

the individual self-reported a move and thereby confirmed residence at the listed Standardized Full Address.

9. **Delivery Sequence File Second Generation (DSF2®) Residential Classification** – I applied USPS DSF2® processing to each post-NCOA address to distinguish residential from commercial locations.

10. **Projection to Full Population** – I extrapolated the Step 9 findings to the entire Step 2 universe, weighting by the sampling fractions established in Step 3.

11. **Allocation of Validated Records to the California and Ohio Classes** – I separated Step 1 through 10 findings into California and Ohio Classes based on the State field in the validated Full Address(es).

12. **Application to Class Representatives** – Finally, I executed the full methodology on the records of two of the Class Representatives, Susan Stephens and William Williams, to quantify and illustrate the methodology's results**.**

## VII.    DESCRIPTION OF ANALYSIS

1.    **STEP 1**: **State-Based Filtering**

46.    To assure that every analyzed ▮▮▮ corresponds to a Class Member, I first aligned the "▮▮▮▮▮▮" with the geographic scope of the classes. The Court certified two damages classes of California or Ohio residents whose teaser profiles include a name and home address. Any ▮▮▮ whose "State" field reflected a jurisdiction other than California ("CA" or "California") or Ohio ("OH" or "Ohio") was removed from further analysis.

47.    The resulting CA- and OH-specific subset became the "Step 1 Dataset," attached as Exhibit 6. By ensuring geographic concordance with class definitions, all subsequent enrichment (Step 2), sampling (Step 3), and validation (Steps 4-11) operate on a population that is relevant, manageable, and traceable to the production data.

Table 3: ███████████ with relevant Full Addresses in California and Ohio and associated telephone numbers.

| ████ | 62,502 |
| --- | --- |
| Full Addresses | 548,999 |
| Telephone Numbers | 372,603 |

2.    **STEP 2: Data Enrichment**

48.    I linked the California- and Ohio-specific ████ to their Standardized Full Name as stored in the ████. This Standardized Full Name field from the ████ provides the canonical identity token for every record that was later sampled and matched.

49.    Next, I attached all unique Standardized Full Addresses from the wider Source Data that fall within California or Ohio and are associated with any of the retained ████ Preserving every Full Address ensures the later matching steps can test residence at multiple points in time without losing geographic fidelity.

50.    Finally, I added any Standardized Telephone Numbers tied to those same ████ normalizing them to a single format and removing invalid or duplicate entries. The resulting "Step 2 Dataset," attached as Exhibit 7, now contains, for each ████ a complete set of Full Name, Full Address, and telephone attributes that will support the random sampling in Step 3 and the identity-verification work in subsequent steps.

Table 4: ███████████ with relevant Full Names AND Full Addresses in California and Ohio and associated telephone numbers.

| ████ | 62,502 |
| --- | --- |
| Full Names | 62,529 |
| Full Addresses | 548,999 |
| Telephone Numbers | 372,603 |

3.    **STEP 3: Random Statistical Sample Selection**

51.    The enriched dataset contained **62,502** unique ▉ Because subsequent verification steps require at least one phone number, I excluded the **5,954** ▉ that lacked any Standardized Telephone Number, leaving a final sampling frame of **56,548** ▉

52.    Using standard sample-size calculations for a finite population (confidence level 95%, margin of error 5%, and population size 56,548), the minimum statistically valid sample is **382** ▉.[20] This size balances precision with efficiency while maintaining representativeness of the underlying population.

53.    I drew the sample with a simple-random method: each of the 56,548 eligible ▉ was assigned an equal probability, a reproducible random-number seed was applied, and 382 distinct ▉ were selected. This "Step 3 Sample," attached as Exhibit 8, serves as the working set for all identity-matching and validation procedures that follow.

4.    **STEP 4: Historical Reverse Telephone Append**

54.    To verify the identity of each sampled record, I obtained historical name-and-address information for every telephone number in the Step 3 sample through PacificEast, a long-standing data-services provider. My firm has worked with PacificEast for nearly a decade because courts supervising class actions routinely accept its outputs, and because its datasets are built for point-in-time look-ups—exactly the task required here.

55.    My company has utilized the services and data provided by PacificEast for performing reverse-append of names and addresses at a given point in time using only a telephone number; reverse-append of email addresses based upon name and mailing address; address updating based upon name and prior address; and other data append services. My company relies on PacificEast because its processes are reliable, are reasonably relied upon by experts in the field, and are approved by courts charged with oversight of class actions, class notice, and settlement administration.

---

[20] *See* https://www.calculator.net/sample-size-calculator.html.

56.     PacificEast provides data enrichment and data verification, data validation, data customization, fraud prevention, identity verification, telemarketing and other industries compliance solutions.[21]   For more than 30 years, PacificEast has provided data services to corporate, government, ecommerce, financial services, healthcare, benefits administration, utility service, telecom, and nonprofit sector clients. PacificEast is a U.S. General Services Administration schedule vendor in the Business Information Services category.

57.     PacificEast serves a wide range of industries, including healthcare, telecommunications, nonprofits, financial services, government, and e-commerce. Its customers are businesses and organizations that require reliable contact data and identity verification. These clients range from small businesses to large enterprises, including Fortune 100 companies, as well as nonprofits and government agencies. PacificEast's solutions help these organizations address fraud prevention, industry compliance, and data validation.

58.     PacificEast is regarded as a reliable source of personal and business information in the class action industry, particularly when it comes to name and address data. The credibility of this data is supported by the diverse and reputable sources from which it is derived, including credit bureaus, credit card companies, public databases (such as white and yellow pages), voter registration records, and many more.

59.     In particular, PacificEast's data is a reliable source for name and contact information associated with a particular telephone number as of a particular date. I understand that PacificEast searches multiple data sources for all historic activity connecting a name and address to a particular phone number and then, based on those searches and diverse data sources, returns the range of dates that a telephone number has been found to be connected with a particular person.

60.     I understand that PacificEast obtains a portion of its data from credit reporting agencies. These agencies gather information from creditors, financial institutions, and businesses that are required to maintain accurate data. Due to the critical role that credit histories play in

---

[21] *See* generally <u>PacificEast.com</u>.

*Kellman, et al. v. Spokeo, Inc.*                                          Page 19 of 33
Declaration of Anya Verkhovskaya

lending decisions, consumers are incentivized to provide correct information to credit reporting agency sources, making this a highly reliable source of personal identification and contact information.

61.    I also understand that information from credit card companies is used by PacificEast. Accurate name and address details are crucial to a credit card company's business, including billing and regulatory compliance. Any discrepancies in these details could result in failed transactions, fraud alerts, or account closures, giving individuals and businesses strong reasons to provide accurate information.

62.    I also understand that PacificEast uses data from white and yellow pages. Those sources provide additional verification because they often include publicly available contact details that are voluntarily submitted, further validating an individual's or business's address and contact information.

63.    Voter registration is another reliable source that I understand PacificEast uses, as individuals are required to provide accurate residential addresses to vote. Given that voter records are government-regulated and require periodic updates, the data are accurate and up-to-date. Fraudulent information or inconsistencies could lead to disqualification from voting.

64.    I understand that PacificEast also integrates data from proprietary databases, utility records, DMV records, bankruptcy filings, and legal documents, which have their own verification processes. Each of these data points serves as a cross-reference to the others, increasing the overall reliability of the name and address information.

65.    Another key reason for the reliability of PacificEast data is the behavior of consumers and businesses when providing their information.

     a.    **Consumers' Incentive for Correct Information**: As described above, I understand PacificEast relies on data sources like credit card companies that maintain data provided by consumers themselves. Consumers are naturally incentivized to provide accurate name and address information, particularly in financial and legal matters. Incorrect information could result in lost benefits

(e.g., missing billing statements), financial penalties (e.g., delinquent notices for unpaid debts), or even legal issues (e.g., failure to receive subpoenas or other legal notices). The direct impact of providing incorrect information drives the high accuracy rate in most databases.

b. **Businesses' Compliance Obligations**: I also understand that PacificEast's data sources include companies that maintain data provided by businesses, which are required to maintain accurate records for regulatory compliance, taxation, and auditing. Failure to do so could result in fines, legal action, or loss of reputation. In addition, businesses are incentivized to provide accurate information about their information to directories like the Yellow Pages because their aim is to reach potential customers. An accurate listing also enhances a business's credibility and can improve a company's search optimization visibility.

66.     I understand that PacificEast has established advanced data aggregation and validation systems that enhance the reliability of its name and address records. These structural advantages include:

a. **Cross-Verification and Data Matching:** I understand that PacificEast uses sophisticated algorithms to cross-verify data from multiple sources. For instance, if the same name and address appear in credit bureau records, utility records, and voter registration records, it provides a high level of confidence that the information is correct.

b. **Regular Updates and Monitoring**: I understand that the sources used by PacificEast are kept up to date, especially from credit bureaus and financial institutions, where information changes frequently. This continuous refresh of data minimizes the likelihood of outdated or inaccurate information.

67.     In conclusion, in my opinion, PacificEast name and address information is highly reliable due to the integrity of the data sources it uses, the incentives for consumers and businesses

to provide accurate information and is sophisticated data verification systems. With its reliance on trusted institutions such as credit bureaus, credit card companies, public databases, and government records, PacificEast provides customers with reliable information. That is further substantiated by PacificEast's longevity as a business, as well as its status as a premier data provider in numerous industries. Consumer behavior, market practices, and regulatory obligations further drive the reliability of this data.

68.     Based on more than twenty years of experience in data analysis, expert testimony and class action administration and given the structural soundness and consumer-driven accuracy, I have found the PacificEast information to be accurate and reliable.

69.     Here, I next prepared an input file for PacificEast (the "PacificEast Input"), attached as Exhibit 9. The PacificEast Input was transmitted with a secure interface.

70.     Upon receipt of the PacificEast Input, a confirmation email was automatically issued, attached as Exhibit 10.

71.     PacificEast performed a standard data append and provided an output file. The output file included names and addresses associated to each telephone number along with the timeframe of the association (the "PacificEast Output"), attached as Exhibit 11, which was made available to CEG via SFTP.

72.     I performed similar work in, but not limited to, the following cases, where the court found that my testimony was sufficiently reliable to be presented to the finder of fact:

     a.     *Berman v. Freedom Financial Network, LLC*, No. 18-01060 (N.D. Cal.)

     b.     *Buchanan v. SiriusXM Radio Inc.,* No. 17-00728 (N.D. Tex.)

     c.     *Heidarpour v. Central Payment Co. LLC,* No. 15-00139 (M.D. Ga.)

     d.     *Krakauer v. Dish Network, LLC*, No 21-1175 (M.D. N.C.)

     e.     *Samson v. United Healthcare,* No. 19-00175 (King County, Wash.)

5.     **STEP 5: Name Matching**

73.     Using the PacificEast output as an independent reference, I compared each sampled ▮▮▮▮ Standardized Full Name from the ▮▮▮▮ to every Reverse-Append Name returned for its

telephone number(s). A match was logged when the names were identical after case-folding, punctuation removal, and normalization of common nicknames (e.g., "Bill" ↔ "William").

74.     If the names were not identical, I determined whether the names sound alike (for example, "Jon Smith" versus "John Smyth"). This phonetic test treats spelling differences as the same name.  I employed a Metaphone phonetic test to capture legitimate spelling variations that sound the same in ordinary speech but differ on paper. Metaphone is a rule-based algorithm that converts any name to a compact phonetic key; two keys that are identical indicate that the underlying names would be pronounced alike by an English speaker. Unlike the older Soundex system, Metaphone recognizes soft- and hard-consonant rules ("C" in *Cynthia* vs. *Christopher*), silent letters, and vowel combinations, producing more accurate results. Courts evaluating class-member identification have accepted Metaphone as a reliable refinement to Soundex when higher accuracy is required.

75.     In addition to the exact-match and Metaphone tests, I imposed a third, prefix-based criterion to capture abbreviated or truncated first names that refer to the same individual. Under this rule, two name components are treated as "Sound-Like" when the first few characters of one appear at the start of the other. For example, "C Mcdonald" and "Christina Mcdonald" satisfy the prefix test because the initial letter "C" in the first version matches the first letter of "Christina" in the second, and the shared surname begins with the identical "Mc." This added screen ensures that common real-world abbreviations—such as an initial followed by a surname—do not cause a genuine match to be missed.

76.     If either one of these methods were identical or sound alike test showed a match, I marked the relevant ▮ as a "Name-Match."

77.     I performed similar work in, but not limited to, the following cases, where the court found my testimony sufficiently reliable to be presented to the finder of fact:

    a.  *Samson v. United Healthcare Services*, No. 19-00175 (King County, Wash.)

    b.  *McMillion v. Rash Curtis & Assoc,* 4:16-cv-03396 (N.D. Cal.)

6.    **STEP 6: Address Matching**

78.    Having verified telephone/name congruence, I next evaluated whether the Standardized Full Address originally produced by Spokeo for each sampled ▮ corresponded to any Reverse-Append Address returned by PacificEast. Consistent with generally accepted data-matching practices—and to avoid rejecting genuine matches on stylistic grounds—I refrained from re-standardizing either data stream and excluded all ZIP-Code elements from the comparison.

79.    To decide whether the street address in the Source Data really describes the same place that PacificEast links to a given telephone number, I applied two common-sense tests—one focused on the numbers in the address, the other on how the street name sounds when spoken. Only addresses that passed both tests were accepted as matches.

80.    First, I looked at the digits that identify the physical location—house number, apartment number, suite, or unit. By stripping away punctuation and words, I compared only the bare numbers in the Source Data to the bare numbers in PacificEast's version. If the digits matched exactly (for example, "123N … Apt 5" versus "123 North… #5"), the address passed through the numeric gate and advanced. If they differed ("400-12 Elm Street" versus "410 Elm Street"), the record did not advance.

81.    Next, I looked to determine whether the street names sound alike in ordinary speech—not whether they are spelled identically. Using the same method called Metaphone, explained above, each word in the street line is reduced to a code that represents its pronunciation. If at least one key word—often the distinctive part of the street name—produced the same phonetic code in both addresses, the address cleared the second gate. Thus "Oak Ridge Drive" and "Oakridge Street." are treated as the same street. By contrast, "55 North Main St." and "55 Elm Dr." share no sounding-alike words and would fail this test even if their house numbers matched.

82.    Numbers alone are not enough, so I next asked whether the street names sound the same when spoken, even if they are spelled a bit differently. Here in addition to Metaphone, I also used the .sql database's built-in "SOUNDS LIKE" phonetic function, which is based on the well-known Soundex algorithm.

83.     Metaphone and Soundex convert any word into a short code representing its pronunciation. If two words share the same code, an English speaker would ordinarily pronounce them the same way. I broke each street line into its individual words and compared the codes. When at least one key word—usually the distinctive part of the street name—produced the same Soundex code in both addresses, the record cleared this "sound-alike" screen.

84.     As a further safeguard, I layered in a prefix-matching rule to catch everyday abbreviations and contractions in street names that a purely phonetic test might overlook. Under this rule, two street-name words are deemed "Sound-Like" when the first three characters of one word are identical to the first three characters of the corresponding word in the other address. Thus, "Oak Ridge St." and "Oakrdg Dr." are accepted as the same street because both key words begin with the identical sequence "O-A-K." By requiring a three-letter match at the start of the word, the rule is strict enough to avoid coincidental overlaps yet flexible enough to accommodate common shorthand spellings and vendor-specific abbreviations.

85.     This test prevents two common errors: mistaking different streets that share the same house number and overlooking genuine matches that differ only because of harmless spelling or abbreviation changes.

86.     If either exact or sound alike tests showed at least one match, I marked the relevant ███ as an "Address-Match."

### 7.     STEP 7: Dual-Match Identification

87.     Having completed discrete tests on Full Names (Step 5) and Full Addresses (Step 6), I next determined which ███ satisfied both conditions—i.e., (1) a confirmed Full Name match (2) a confirmed Full Address match—during the class period for that same reverse append data. This dual-match requirement serves as the highest level of identity corroboration available from the data produced.

88.     The results from Steps 5 and 6 were connected on ███ A ███ qualified for further analysis only if it carried the value "Name-Match" *and* "Address-Match," attached hereto as Exhibit 12.

Table 5: Number of sample records "Name-Match" *and* "Address-Match" ▮ in California and Ohio with Full Names and Full Addresses.

| ▮ | 286 |
|---|---|
| Full Names | 286 |
| Full Addresses | 512 |

89.    Additionally, I applied this dual-match test to identify those ▮ where I could confirm the date range provided by PacificEast overlapped with the purchase date(s) corresponding to the ▮, attached hereto as Exhibit 13.[22] Where multiple date ranges existed, the most inclusive range was used for the overlap test. Any ▮ whose corroborated name-and-address linkage fell entirely outside the class period was reclassified as a non-match for this query.

Table 6: Number of sample records "Name-Match" *and* "Address-Match" ▮ in California and Ohio with Full Names and Full Addresses with added delimiter of Purchase Dates.

| ▮ | 225 |
|---|---|
| Full Names | 225 |
| Full Addresses | 363 |

8.    **STEP 8: Independent Verification by USPS National Change of Address**

90.    For every ▮ that could not be confirmed through the telephone-based name-and-address comparison, I sought a final, independent means of validating address information. I submitted each unresolved name-and-address pairing to the United States Postal Service's National Change of Address (NCOA) database—the federal repository of change-of-residence notices that courts routinely recognize as authoritative in class-action notice and settlement administration. I retained Peachtree Data, Inc. ("Peachtree Data") for this.

---

[22] Such date delimitation can be applied to any and all queries and steps in this Declaration. It signifies that those Full Addresses were, more likely than not, current residential addresses at the time they were associated with the Full Names and the purchase(s) of the subscription after viewing the potential Class Members' teaser profile was/were made.

91.     Peachtree Data is a USPS-licensed Full-Service NCOA Link provider that receives the complete, 48-month change-of-address file directly from the Postal Service and refreshes its copy each week.[23] The company has specialized in address-quality and data-hygiene services for more than three decades, supplying government agencies, financial institutions, healthcare systems, and other regulated industries that require high-accuracy contact data. Courts overseeing class-action notice programs routinely recognize both NCOA Link and licensed vendors, such as Peachtree Data, as reliable sources for confirming current and historical addresses.

92.     I provided Peachtree Data with all the possible combinations of the unresolved name-and-address pairs per ███ (the "Peachtree Data Input"), attached hereto as Exhibit 14A, containing 592 variations. The vendor compared each entry to the NCOA Link file and returned only records where the individual name matched the mover's notice accepted by USPS (the "Peachtree Data Output Package"), attached hereto as Exhibit 14B. A record meeting this condition confirmed that the original address submitted to Peachtree Data for NCOA was a correct Standardized Full Address with a correct Standardized Full Name combination, where present, and was reclassified "Name-Match" *and* "Address-Match" accordingly and respectively. Records receiving no qualifying hit were excluded from subsequent projections.

93.     By incorporating the NCOA verification step—an approach long accepted by federal and state courts—I ensured that every plausible avenue for corroborating class membership was exhausted while maintaining methodological rigor, attached as Exhibit 15.

Table 7: Number of sample records "Name-Match" *and* "Address-Match" ███ in California and Ohio with NCOA confirmed addresses.

| ███ | 17 |
|---|---|

94.     I performed similar work in, but not limited to, the following cases, where the court found that my testimony was sufficiently reliable:

>     a.   *In re Bear Stearns Cos., Inc. ERISA Litig.,* No. 08-MDL-1963 (S.D.N.Y.)

---

[23] *See* generally https://www.peachtreedata.com/.

    b.   *In re Beazer Homes USA, Inc. ERISA Litig.*, No. 07-cv-00952 (N.D. Ga.)

    c.   *Black v. Metso Paper USA, Inc.*, No. 05-cv-1951 (M.D. Pa.)

    d.   *Blanco v. KeyBank USA, N.A.*, No. 03-cv-524 (N.D. Ohio)

    e.   *Valley Nat'l Bank v. Cahn*, No. L-0504-04 (N.J. Super. Ct.)

    f.   *Veal v. Crown Auto Dealerships, Inc.*, No. 04-cv-0323-T-27 (M.D. Fla.)

    g.   *Walker v. Hill Wallack LLP*, No. MID-L-003480-08 (N.J. Super. Ct.)

    h.   *Wells v. DTD Enterprises, Inc.*, No. L-9012-07 (N.J. Super. Ct.)

    i.   *Wenger v. Cardo Inc.*, No. MID-L-4924-07 (N.J. Super. Ct.)

    j.   *Wenger v. Freehold Subaru, LLC*, No. MON-L-4003-10 (N.J. Super. Ct.)

    k.   *Williams v. CBE Grp.*, No. 11-cv-3680-PS (D.N.J.)

    l.   *Yarviv v. AT&T Corp.*, No. SOM-L-272-05 (N.J. Super. Ct.)

    m.   *Yingling v. eBay, Inc.*, No. 09-cv-01733 (N.D. Cal.)

9.    **STEP 9: Delivery Sequence File Second Generation (DSF2®) Residential Classification**

95.    After confirming address ownership through the NCOA process (Step 8: Independent Verification by USPS National Change of Address and Step 7: Dual-Match Identification, collectively further referenced as the "Post-NCOA Address File"), I turned to identifying location as a residential or commercial dwelling. I engaged PacificEast—a USPS-licensed Full-Service provider whose platform incorporates the U.S. Postal Service's Delivery Sequence File Second Generation (DSF2®).

96.    DSF2 ® is a comprehensive address database maintained by USPS. It contains over 165 million records of deliverable addresses across the U.S., including details such as delivery type (residential, business, seasonal, vacant), delivery method (curbside, door slot, cluster box), and walk sequence numbers. For over thirty years, PacificEast has supplied address-quality and compliance services to Fortune 100 companies, government agencies, financial institutions, healthcare systems, and telecom carriers. Courts supervising class-action notice and settlement

administration regularly accept DSF2® and similar coding, delivered by vendors such as PacificEast, as a reliable means of distinguishing residential from commercial addresses.

97.    I transmitted the Post-NCOA Address File—limited to California and Ohio—to PacificEast via secure SFTP (the "PacificEast DSF2 Input"), attached hereto as Exhibit 16A, containing 530 records. PacificEast matched each record to the DSF2® product and returned an output detailing, among other things, the residential status of the addresses via codes R (residential), B (business), U (unknown), or blank (not available) (the "PacificEast DSF2 Output"), attached hereto as Exhibit 16B.

98.    Addresses coded R for residential were retained as satisfying the "home address" requirement of the certified classes.

99.    PacificEast's DSF2® module is built on the same USPS master file employed by parcel shippers, fraud-prevention systems, and regulatory-compliance programs nationwide. Its status as a USPS-licensed provider—and its long-standing track record within regulated industries.

100.    By applying USPS DSF2® coding through PacificEast, Step 9 ensures that only bona fide residential addresses remain in the analytical universe, thereby aligning the data with the geographic and residential boundaries in the class definitions.  The "Step 9 Dataset" is attached hereto as Exhibit 17.

Table 8: Number of sample records "Name-Match" *and* "Address-Match" ▮ in California and Ohio with confirmed residential addresses.

| | |
|---|---|
| ▮ | 280 |
| Full Names | 280 |
| Full Addresses | 437 |

10.    **STEP 10: Statistical Projection to the Full Class Universe**

101.    With the sample fully vetted through Steps 1–9, I converted the results into class-wide numbers in three straightforward moves:

102.    The universe for projection is the 56,548 California- and Ohio-resident ▮ that contained at least one telephone number (established in Step 3). From that frame I had already

drawn a simple-random sample of 382 ████—large enough to give a 95% confidence level with a 5 percentage-point margin of error.

103.    Each sampled ████ was marked "validated" if it passed all prior checks (name, address, NCOA, and residential address identification). Dividing the number of validated records by 382 yields the sample proportion.

104.    Because every ████ had an equal chance of selection, each validated record in the sample "stands for" about 148 class members (56,548 ÷ 382). Multiplying the sample proportion—and its 5% confidence band—by 56,548 produces a point estimate and a two-sided 95% confidence interval for the total number of validated class members.

105.    These steps follow the basic, court-approved logic of simple-random-sample inference: count the passes, apply the sample's success rate to the full population, and supply an error range so the Court can see the estimate's precision.

106.    That resulted in 280 ████ that had "Name-Match" *and* "Address-Match" in Ohio and California that also were residential addresses out of the sample size of 380 ████ or 73.3%. Extrapolating 73.3% to the entire population of 56,548 ████ makes an estimated potential class size of 41,451 ████ with a 95% confidence interval of approximately ±2,827 (which is 5% of 56,548), yielding a range of 39,368 to 43,533 potential Class Members.

11.    **STEP 11: Allocation of Validated Records to the California and Ohio Classes**

107.    Once every sampled ████ had cleared the full validation pathway (Steps 1 through 10), I divided the confirmed population into the two certified classes—California, attached hereto as Exhibit 18A, and Ohio, attached hereto as Exhibit 18B—by reference to the state component of each record's final, validated address.

108.    For every ████ that survived all the previous steps, I extracted the "State" element of its matched residential address. Because all addresses were either California or Ohio by design, no further geographic filtering or disambiguation was required.

Table 9: Number of sample records "Name-Match" *and* "Address-Match" ▮ in California with confirmed residential addresses.

| California ▮ | 201 |
|---|---|
| California Full Names | 201 |
| California Full Addresses | 314 |

Table 10: Number of sample records "Name-Match" *and* "Address-Match" ▮ in Ohio with confirmed residential addresses.

| Ohio ▮ | 81 |
|---|---|
| Ohio Full Names | 81 |
| Ohio Full Addresses | 123 |

12.    **STEP 12: Application of the Full Methodology to Two Class Representatives**

109.    I compiled a list of the two Class Representatives' telephone numbers from the Source Data and discovery documents, including the Stephens Responses and the Williams Responses (the "Plaintiffs' Numbers"). Table 11 below lists these Plaintiffs' Numbers.

Table 11

| Telephone Number | Plaintiff |
|---|---|
| ▮ | Williams |
| ▮ | Williams |
| ▮ | Williams |
| ▮ | Williams |
| ▮ | Williams |
| ▮ | Williams |
| ▮ | Williams |
| ▮ | Williams |
| ▮ | Williams |
| ▮ | Stephens |
| ▮ | Stephens |

110.    From the Plaintiffs' Numbers I prepared an input file for PacificEast (the "Plaintiffs PacificEast Reverse Append Input"), attached hereto as Exhibit 19. The Plaintiffs PacificEast

Reverse Append Input included 11 unique telephone numbers, as outlined in Table 11, and was transmitted to PacificEast via a secure interface.

111.    Upon receipt of the Plaintiffs PacificEast Reverse Append Input, a confirmation email was automatically issued, attached hereto as Exhibit 20.

112.    PacificEast performed the standard data append and provided an output file. The output file included names and addresses associated to each telephone number (the "Plaintiffs PacificEast Reverse Append Output"), attached hereto as Exhibit 21, which was made available to CEG via SFTP.

113.    I next used the Plaintiffs PacificEast Reverse Append Output to perform the same comparison processes completed in the preceding steps applied to the Sample Numbers.

114.    Plaintiff Williams' addresses as listed within the Williams Responses included, among others, ███████████████████. This address and Mr. Williams' name were confirmed within Plaintiffs Output.

115.    Plaintiff Stephens' address within the Stephens Responses is ████████████████████████████. This address and Ms. Stephens' name were confirmed within Plaintiffs Output.

116.    Plaintiffs' addresses were confirmed to be residential utilizing the DSF2® methodology. From the Plaintiffs' Numbers, I prepared an input file for PacificEast (the "Plaintiffs' PacificEast DSF2® Input"), attached hereto as Exhibit 22. The Plaintiffs' PacificEast DSF2® Input included two addresses and was transmitted to PacificEast.

117.    PacificEast performed data processing and delivered the output file (the "Plaintiffs PacificEast DSF2® Output") attached hereto as Exhibit 23.

118.    Both addresses were marked as R for residential.

## VIII.  CONCLUSION

119.    I am offering the following opinion in this Declaration: Using the data provided by Spokeo, there is a reliable and efficient method by which it can be determined whether relevant Class teaser profiles included an identifiable name and an associated residential address.

//

//

I declare under the penalty of perjury that this Declaration is true. Executed at Milwaukee, Wisconsin, this May 22, 2025.

Anya Verkhovskaya

— **EXHIBIT  1** —



# Class Experts Group, LLC

Class Experts Group, LLC (CEG) is a trusted partner in class action litigation, offering deep expertise in data analysis, expert witness testimony, and full-scale class action administration.

**CLASS EXPERTS GROUP** LLC
Expert Services   Data Analysis   Notice & Administration



# Table of Contents

1   INTRODUCTION TO CLASS EXPERTS GROUP..................................................................2

2   OUR SERVICES ...............................................................................................................3

   2.1  DATA ANALYSIS.........................................................................................................3

   2.2  EXPERT TESTIMONY AND REPORTING...................................................................4

      2.2.1 Representative Cases ........................................................................................5

   2.3  CLASS ACTION ADMINISTRATION ..........................................................................5

      2.3.1 Class Action Notice ...........................................................................................5

   2.4  CLAIMS ADMINISTRATION......................................................................................6

      2.4.1 Claims Management ..........................................................................................7

      2.4.2 Claims Processing .............................................................................................7

      2.4.3 Data Security .....................................................................................................8

   2.5  TELEPHONE AND EMAIL SUPPORT .........................................................................9

   2.6  SETTLEMENT FUND DISTRIBUTION ........................................................................9

   2.7  QUALIFIED SETTLEMENT FUND MANAGEMENT AND REPORTING.........................10

CONTACT US ........................................................................................................................12

© 2025 Class Experts Group LLC



# 1    <u>INTRODUCTION TO CLASS EXPERTS GROUP</u>

Class Experts Group, LLC (CEG) is a trusted partner in class action litigation, offering proven proficiency in data analysis, expert witness testimony, and full-scale class administration.

The executive team heading CEG boasts decades of combined experience in delivering complex litigation support in class action consumer litigations, the Telephone Consumer Protection Act (TCPA), the Video Privacy Protection Act (VPPA), the Employee Retirement Income Security Act (ERISA), human rights, data breach, the Real Estate Settlement Procedures Act (RESPA), insurance, and other class action matters.

Established in 2018 as a boutique firm with a worldwide presence, CEG offers a comprehensive range of services tailored to intricate litigation support. Our offerings include data analysis, expert witness testimony, and class action notice and settlement administration. Whether your case demands data assessment, identification and location of class members, class notice, claims processing, or settlement fund distribution, CEG stands ready to be an essential ally on your team. We partner closely with you, offering seasoned advice based on our wealth of experience.

Founded on principles of collaboration and transparency, CEG has cultivated a distinct, women-directed business environment that prioritizes quality. We promote an atmosphere of honesty and fair dealing, extending these values to clients and class members alike.

These principles, combined with our unique service offerings combining data analysis, expert testimony, and settlement administration, position CEG as a trailblazer and innovator in the industry. Our clients consistently choose CEG because we are problem solvers and team players, offering workable solutions customized to each case's unique specifications.

Our team brings not only analytical precision but also a deep understanding of the human elements in class litigation. We know that behind every data point is a person, and we approach each engagement with empathy, discretion, and a commitment to justice.

CEG is also known for its adaptability and responsiveness. We thrive in fast-paced environments where agility, accuracy, and strategic foresight make all the difference. With in-house expertise across disciplines and access to cutting-edge tools, we are able to scale quickly, troubleshoot effectively, and deliver results that meet the highest standards—on time, every time.

© 2025 Class Experts Group LLC



## 2  OUR SERVICES

### 2.1  DATA ANALYSIS

In complex litigation, data analysis involves systematic examination of available records, files, and documents using analytical and logical reasoning to scrutinize each element within the provided data. Information is gathered from various sources, reviewed thoroughly, and then processed to derive conclusions, findings, and opinions.

CEG's proficiency in deciphering and articulating the story embedded within the data allows our expert witnesses to present that data efficiently and effectively in written reports and live testimony supported by factual and data-based foundations.

CEG's data analysis services are constructed on a reliable technology framework and are based on well-documented procedures, ensuring the secure collection, management, and handling of data. Our streamlined approach allows us to evaluate data productions of any scale with precision and cost efficiency.

 CEG's expert witnesses regularly evaluate and provide opinions for class cases, including but not limited to, the following categories of records:

- Automated Audio File Transcription
- Banking
- Bankruptcy
- Billing
- Consent
- Credit Card
- Customer Relationship Management (CRM)
- Email
- Facsimile
- Government
- Insurance
- Internet Protocol (IP)

- Lead Files
- Medical
- Mortgage
- National Do Not Call Registry (NDNCR)
- Retailer
- Retirement Plan
- Telephone Call Logs
- Text
- Transactional
- United States Postal Service (USPS)
- Vehicle Deal Jackets
- Vital Statistics
- Voicemail Logs

We transform complex data into clear, actionable insights that support litigation strategy. Our process begins with cleansing of data, followed by layered analysis to ensure accuracy. Using advanced tools and custom scripting, we adapt to each case—whether structured databases or unstructured records—turning raw information into persuasive narratives.

© 2025 Class Experts Group LLC



## 2.2    EXPERT TESTIMONY AND REPORTING

Expert witness testimony plays a pivotal role in nearly all putative class action lawsuits, particularly during the class certification phase where such evidence is relied upon to address the requirements of Federal Rule of Civil Procedure 23.

For over two decades, CEG's team of experts has provided opinions and testimony in hundreds of consumer protection cases.

CEG's experts offer strategic insight and provide testimony on multiple aspects of litigation, including numerosity, ascertainability, class member identification and location, adequacy of notice, and settlement administration procedures. CEG's experts offer impartial testimony, forming independent opinions grounded in data, facts, and evidence. Class certification, in particular, frequently involves a "battle of experts". Our experts work closely with you to prepare and deliver testimony to reinforce the distinct claims in your case.

CEG's expert witnesses also address opposing reports, present rebuttal opinions, overcome Daubert challenges, provide deposition testimony, and appear at trial. In fact, CEG's senior expert witness has testified in trials and numerous class certification and other court hearings, bringing extensive cross-examination experience to the proceedings.

Other services include mediation preparation which involves developing a strategy and understanding the interests and positions of parties. CEG conducts preliminary data analysis based on data produced during an initial discovery and provides a basis for our clients to understand the value of the case.  This is a critical step for a successful negotiation process.

CEG assists with the equally important step of damages analysis, which includes analysis to support the class definition and determining the types of damages incurred by the proposed class. CEG helps develop an efficient and effective distribution plan to allocate damage among class members, often involving a claims process and a proposed formula for fair allocation.

CEG reviews proposed settlement terms as they relate to the class notice plan, claims administration and fund distribution and estimates the cost.

Finally, once the terms of the settlement are agreed upon, pre-settlement consultation involves discussions and planning to ensure that the settlement process is managed efficiently and effectively. Key aspects of the consultation process include reviewing the draft settlement agreement, establishing a case-specific timeline that accommodates the components proposed under the terms of the settlement, and evaluating notice plan adequacy, claims validation requirements, and settlement fund distribution protocols. CEG develops methods for identifying, locating, and notifying class members and a detailed notice plan that complies with legal and due process requirements.

© 2025 Class Experts Group LLC



### 2.2.1 *Representative Cases*

*Krakauer v. Dish Network, LLC*, Civil Action No: 14-cv-333 (M.D.N.C.)

The court denied a Daubert challenge. Ms. Verkhovskaya's expert testimony at a jury trial was pivotal, leading the jury to award damages for each violation she identified.

Later, in denying a motion to overturn the jury verdict awarding the class more than $20 million in relief, the court found "Ms. Verkhovskaya provided clear, cogent testimony explaining her methodology and the bases for her opinions." Damages in the case were trebled to more than $61.5 million, and the award was upheld on appeal.

*McMillion v. Rash Curtis & Associates*, Case No. 3:16-CV-03396 (N.D. Cal.)

Ms. Verkhovskaya used reverse append and other techniques to separate debtors from non-debtors in the defendant's telephone call data, and to identify telephone calls made to wireless telephone numbers. Ms. Verkhovskaya's expert testimony at a jury trial was pivotal, leading the jury to award damages for each violation she identified. The class was awarded more than $267 million in damages, at the time one of the largest TCPA damages awards ever.

## 2.3    CLASS ACTION ADMINISTRATION

### 2.3.1 *Class Action Notice*

CEG is a nationally recognized expert in the design, preparation, and dissemination of legal notice. Ensuring that class members are aware of, understand, and can act on their legal rights is the essence of Federal Rules of Civil Procedure Rule 23. By using industry-approved processes and accredited consumer data, CEG develops notice programs that fully comply with the requirements of Rule 23 and its state equivalents. Our notice programs have never faced a successful objection.

CEG's case-specific notice programs utilize available class data, demographic, geographic, behavioral, and interest-based criteria to effectively connect with specific audiences via direct mail, email, third-party notice, publication, and digital media. Advancements in technology and communication outlets offer an expanding range of methods to efficiently and effectively notify class members.

Courts have also acknowledged the effectiveness of CEG's notice programs. CEG was appointed as the Settlement Administrator in the matter of *Leslie Ann Wilkie Peltier, et al. v. Deb Haaland, et al.*, No. 20-cv-03775 (D. D.C.), a class action lawsuit to redress alleged breaches of trust by the United States Department of the Interior, the United States Department of the Treasury, and the United States of America with respect to the accounting and management of two Judgment Awards of the Indian Claims Commission (ICC). The $59

© 2025 Class Experts Group LLC



million settlement provided relief to several generations of tribal families. As part of this litigation, CEG's team worked over the course of several years to develop a novel class notice plan and claims adjudication process that would effectively and efficiently distribute settlement funds to surviving tribal members and their heirs, many of whom are ageing.

At the preliminary approval hearing, presiding Federal Judge Thomas F. Hogan overseeing the settlement noted that CEG was "instrumental in helping to shape the deal…"

At the final settlement approval fairness hearing class counsel noted that CEG "made extensive efforts to identify and reach" the class and that CEG's class notification efforts "have met or gone beyond the Rule 23 and due process…requirements…The notice program here has been thorough…" In his order granting final class action settlement agreement approval, Federal Judge Thomas F. Hogan noted that CEG's class notification process provided "the best notice practicable under the circumstances…and it was reasonably calculated to reach the class members."

## 2.4   CLAIMS ADMINISTRATION

Claims administration is a critical component of successful class action settlements, fulfilling several essential functions that promote accuracy, transparency, and fairness. It involves managing the often-complex task of processing thousands—or even millions—of claims in a structured and precise manner. This significantly reduces the risk of errors or fraud and helps preserve the integrity of the process from start to finish.

In addition to managing data and claims, a key role of claims administration is to support class members throughout the process. This includes providing clear instructions on how to submit claims, answering questions, and ensuring that all participants understand their rights and the steps necessary to seek compensation. Another vital function is the timely distribution of settlement funds, which prevents unnecessary delays in providing relief to eligible class members. The administration process also addresses any appeals submitted by class members who may dispute their claim determination or compensation amount, helping to ensure fairness and consistency across the board.

CEG brings decades of experience managing the sensitive and complex data required in settlement administration. We have supported clients across a wide range of industries, including financial services, healthcare, manufacturing, and professional services. Our established systems, infrastructure, and refined operational processes enable us to deliver efficient, accurate, and transparent administration tailored to the needs of each unique case.

© 2025 Class Experts Group LLC



### 2.4.1 _Claims Management_

At CEG, we pride ourselves on maintaining the highest standards of quality and security to ensure meticulous attention to detail. Our claims management system is designed to ensure the secure, transparent, and efficient administration of class action lawsuits. We incorporate several essential components to comply with legal requirements while maintaining ethical and data protection standards.

CEG ensures strict adherence to the provisions outlined in the court-approved settlement agreement. This includes ensuring the eligibility criteria for claimants is met and executing the distribution plan. CEG's system includes comprehensive anti-fraud measures. We maintain detailed audit trails, creating clear records of all transactions and decisions throughout the claims process.

CEG emphasizes reporting and transparency as critical components of our claims management system. We provide regular, detailed reports to the court and attorneys, outlining the status of claims, including the number of claims received, approved, or denied, as well as the amounts distributed. In today's privacy-conscious environment, CEG's system complies with relevant data protection and privacy laws.

At CEG, our commitment to precision, integrity, and transparency drives every aspect of claims administration. By combining secure technology with hands-on expertise, we ensure that each claim is handled accurately, ethically, and in full compliance with legal and privacy standards—providing peace of mind to courts, counsel, and class members alike.

### 2.4.2 _Claims Processing_

At CEG, class action claims processing and auditing is a meticulous and structured process designed to ensure fairness and accuracy in the distribution of settlement funds, safeguarding the interests of both claimants and defendants. Our process begins with the collection of claims, where all submitted forms, documents, and supporting evidence from class members are gathered. This is followed by a precise data entry process to ensure that all information is accurately recorded in our claims management system.

Once data is entered, CEG undertakes a thorough verification of claims, ensuring each claim meets the eligibility criteria outlined in the settlement agreement. This involves reviewing supporting documentation, such as financial records or medical reports, and validating data by cross-referencing internal and external databases to confirm the accuracy of claims.

CEG's system allows class members to file claims online, offering a convenient and efficient way to participate in the settlement process. Online claim filing simplifies the submission process, enabling class members to easily provide the necessary information.

© 2025 Class Experts Group LLC



This digital option reduces administrative costs, speeds up the processing of claims, and increases participation rates by eliminating barriers such as mailing delays or lost paperwork. Additionally, CEG's online filing system offers features like automatic confirmation of submission, providing class members with greater transparency and assurance throughout the claims process.

The next phase, claims analysis and evaluation, involves calculating compensation amounts in accordance with the settlement terms. During this process, we also identify and remove duplicate claims to prevent double payments. Our dedicated disbursements team brings extensive expertise in fraud detection and prevention, performing daily monitoring and account reconciliation to protect financial transactions, and are trained to respond to red flag alerts. With stringent quality controls in place, we ensure precise and secure payment processing throughout the disbursement phase.

Throughout the auditing process, CEG maintains detailed audit trails to ensure transparency and accountability. We generate compliance reports summarizing the findings, including statistics on approved, denied, and disputed claims, providing a comprehensive overview of the claims auditing process.

At CEG, every step of the claims process is guided by our dedication to fairness, accuracy, and accountability. From intake to final disbursement, we combine robust systems with expert oversight to ensure settlement funds are distributed efficiently, securely, and in full compliance with court-approved terms—delivering reliable results to all parties involved.

### 2.4.3 _Data Security_

CEG has implemented strict internal protocols to prevent fraudulent activity and protect the sensitive information of our clients and class members. To ensure data integrity, all modifications must be made through CEG's proprietary applications, eliminating direct access to production databases. Every change to our systems is meticulously tracked through a version control system, with all program modifications subject to auditing. Access to case data is restricted to authorized personnel assigned to the matter, reinforcing security and compliance.

Additionally, if data modifications are necessary, the original records are preserved alongside the edited versions, with the system logging the identity of the individual making the change. These measures provide a robust framework for maintaining accuracy, security, and accountability in all aspects of our operations.

© 2025 Class Experts Group LLC



## 2.5    TELEPHONE AND EMAIL SUPPORT

Integral to a comprehensive notice plan is providing 24/7 communication accessibility means of communication by telephone and email.  CEG's case communication specialists are trained and equipped to handle a wide range of class member inquiries, significantly reducing the need for escalations to Counsel by providing thorough and accurate responses. With a scalable team and the latest technology, CEG's call center is equipped to adapt to a variety of case sizes.

CEG's communication center services include, but are not limited to, the following:

- Dedicated toll-free number for each case
- Case-specific, client-approved call script
- Interactive Voice Response (IVR) system
- Answering frequently asked questions
- 24 hours a day, 7 days a week access

- Inbound and outbound call tracking
- Multi-lingual translation and transcription
- Detailed reporting
- Voicemail transcription
- Forwarding communications to class counsel, if needed
- Live operators per case requirements

Call center agents and call scripts are regularly monitored throughout the administration, and adjustments are made, as needed, based on the nature of inquiries and needs of class members.

## 2.6    SETTLEMENT FUND DISTRIBUTION

Once the settlement allocation determinations have been calculated, audited, and finalized, the fund distribution commences. There are various forms of payment options available in a class action, including but not limited to:

- Check payment
- Rebate, refund, or credit
- Retirement or pension plan
- Product repair or replacement

- Coupon or voucher
- Goods or services
- Gift card
- Injunctive relief

Forms of payments, such as Zelle, PayPal, Venmo, Amazon Pay, Google Pay, Apple Pay, e-checks, ACH, and others are becoming increasingly popular as efficient alternatives to traditional check distributions. These digital payment methods offer faster and more convenient ways for class members to receive their settlement funds, often providing near-instant access to their compensation. By leveraging these platforms, CEG reduces administrative costs and eliminates issues like lost or uncashed checks. These payment options provide tracking and receipt confirmation, giving all parties clear records.

© 2025 Class Experts Group LLC



## 2.7   QUALIFIED SETTLEMENT FUND MANAGEMENT AND REPORTING

At CEG, we specialize in the comprehensive management of Qualified Settlement Funds (QSFs), a vital component of settlement administration.

With decades of experience, we manage every phase of QSF administration — including fund creation, record-keeping, oversight, and tax reporting—ensuring settlement funds are handled efficiently and in full compliance with all legal and regulatory requirements.

The process begins with obtaining court approval, where we assist in preparing and submitting the necessary documentation to establish the QSF. Once the court order is secured, CEG facilitates the complete setup of the fund, including obtaining an Employer Identification Number (EIN) from the IRS for tax compliance purposes. We also establish a segregated, federally insured bank account to hold the settlement proceeds, ensuring the security, transparency, and traceability of all financial transactions.

As part of our QSF management services, CEG provides escrow agency support to safeguard and manage the settlement funds throughout the lifecycle of the administration. We deliver detailed reporting and reconciliation services to ensure full transparency and accountability.

Our team generates comprehensive financial reports that monitor all key fund activities — deposits, distributions, investments, earnings, and administrative expenses — giving stakeholders a clear and real-time view of the fund's status and performance.

In collaboration with tax professionals, CEG ensures that required tax returns are prepared and filed, addressing any federal, state, or local withholding obligations. We maintain rigorous compliance with all applicable laws, including complex banking and securities regulations, ensuring the QSF operates within the full scope of legal mandates.

Our process includes the use of MICR encoding and bank-approved checks, positive pay verification, bank reconciliation, maintenance of investment records, and internal accounting logs. By maintaining precise, up-to-date records, CEG ensures that the QSF adheres to court orders and regulatory requirements, while also providing the necessary documentation for tax filings, audits, and other legal obligations.

If there are unclaimed or undistributed funds at the conclusion of the administration, CEG assists in implementing the options defined by the settlement agreement and the parties involved. This may include reversion, where the remaining funds are returned to the defendant, or a *cy pres* distribution to a designated charitable organization, as specified in the agreement. In instances where escheatment is necessary, we ensure that unclaimed funds are transferred to the state in accordance with unclaimed property laws.

© 2025 Class Experts Group LLC



# CONTACT US

Class Experts Group, LLC
11520 N Port Washington Rd, #215
Milwaukee, WI  53092

(262) 302-4443
info@classexpertsgroup.com
classexpertsgroup.com

Class Experts Group, LLC ©2025

**CLASS EXPERTS GROUP** LLC
Expert Services   Data Analysis   Notice & Administration

— EXHIBIT  2 —

# ANYA VERKHOVSKAYA

President and Chief Executive Officer
Class Experts Group, LLC

**Expert Witness**
**Claims Administrator**

**Resumé**
**2025**



11520 North Port Washington Road, Suite 215
Milwaukee, WI  53092

classexpertsgroup.com
anyav@classexpertsgroup.com
linkedin.com/in/anyaverkhovskaya

(262) 302-4443

## TABLE OF CONTENT

BIOGRAPHY ............................................................................................................... 2

REPRESENTATIVE CASES BY CATEGORY ........................................................... 2

Telephone Consumer Protection Act (TCPA) Expert Witness Cases ........................... 2

Telephone Consumer Protection Act (TCPA) Notice & Claims Administration Cases ............. 7

Employee Retirement Income Security Act (ERISA) Administration Cases .............................. 8

Consumer Protection Notice & Claims Administration Cases .................................... 9

Civil Rights Notice & Claims Administration Cases ................................................... 12

U.S. Securities and Exchange Commission Fairness Actions Notice & Claims Administration Cases ...................................................................................................................... 13

Antitrust Notice & Claims Administration Cases ....................................................... 14

Securities Fraud Notice & Claims Administration Cases ............................................ 14

Other Notice & Claims Administration Cases ............................................................ 17

WORK HISTORY ..................................................................................................... 18

EDUCATION ............................................................................................................ 19

## BIOGRAPHY

Ms. Anya Verkhovskaya is a nationally recognized expert witness and claims administrator who has provided expert analysis, testimony, and litigation support services in federal and state class actions relating to the Telephone Consumer Protection Act (TCPA), consumer protection, human and civil rights, the Employee Retirement Income Security Act (ERISA), securities fraud, antitrust, pharmaceuticals, insurance, and other consumer protection cases, as well as in fairness actions before the U.S. Securities and Exchange Commission. As the President and Chief Executive Officer of Class Experts Group, LLC (CEG), Ms. Verkhovskaya leads a team of professionals with extensive experience in the management and analysis of large data sets and consumer records for class action litigations and has a collective experience of overseeing notice and claims administration for more than 1,700 class actions.

Ms. Verkhovskaya has been an industry leader in analyzing class-wide consumer data, including the following types of records: telephone call and/or text logs; audio recordings; banking; bankruptcy; consent; billing; Customer Relationship Management (CRM); government; medical; mortgage; transactional; vehicle deal jackets; vital statistics; and more.

Ms. Verkhovskaya regularly provides expert opinions and testimony in consumer protection cases on multiple aspects of litigation, including numerosity, ascertainability, class member identification and location, adequacy of notice, and settlement administration procedures.

Ms. Verkhovskaya has testified at more than 80 depositions, hearings, and at two jury trials. Her expert testimony and data analysis methods have been admitted into evidence over *Daubert* and similar challenges in multiple class action lawsuits. Courts have repeatedly recognized her testimony as "clear" and "cogent" and acknowledged her "extensive experience."

Ms. Verkhovskaya has been an integral part of some of the largest settlement programs relating to documentation and restitution for Holocaust victims and their heirs. For more than seven years, she worked with director Steven Spielberg's Survivors of the Shoah Visual History Foundation (now the USC Shoah Foundation Institute), handling eastern European and middle Asian operations. Ms. Verkhovskaya was a notice administrator  for the *In Re Holocaust Victim Assets Litigation*, the German Forced Labour Compensation Programme, consulted on notice and outreach for the International Commission on Holocaust Era Insurance Claims (ICHEIC), and was the managing director of Holocaust Era Asset Restitution Taskforce (Project HEART).

## REPRESENTATIVE CASES BY CATEGORY

### Telephone Consumer Protection Act (TCPA) Expert Witness Cases

*Krakauer v. Dish Network, LLC,* No. 1:14–CV–333 (M.D.N.C.). The  court  denied a *Daubert* challenge. Ms. Verkhovskaya's expert testimony at a jury trial was pivotal, leading the jury to award damages for each violation she identified. Later, in denying a motion to overturn the jury verdict awarding the class more than $20 million in relief, the court found "Ms. Verkhovskaya provided clear, cogent testimony explaining her methodology and the bases for her opinions." Damages in the case were trebled to more than $61.5 million, and the award was upheld on appeal.

***McMillion v. Rash Curtis & Associates*, 4:16-cv-03396 (N.D. Cal.).** Ms. Verkhovskaya used reverse append and other techniques to separate debtors from non-debtors in the defendant's telephone call data, and to identify telephone calls made to wireless telephone numbers. Ms. Verkhovskaya's expert testimony at a jury trial was pivotal, leading the jury to award damages for each violation she identified. The class was awarded more than $267 million in damages, at the time one of the largest TCPA damages awards ever.

***Chinitz v. Intero Real Estate Services*, 5:18-cv-05623 (N.D. Cal.).** The court overruled the defendant's motion to strike/exclude and further denied the defendant's motion for summary judgment on plaintiff's TCPA claims. The parties subsequently reached a $13 million settlement regarding the TCPA class.

*Abante Rooter & Plumbing, Inc. v. Alarm.com, Inc.,* No. 15-cv-06314 (N.D. Cal.)

*Abdullah v. FedEx Corp. Services, Inc.*, No. 16-cv-03967 (N.D. Ill.)

*Bakov v. Consol. World Travel*, No. 15-cv-02980 (N.D. Ill.)

*Baldwin v. Miracle-Ear, Inc.*, No. 20-cv-01502 (D. Minn.)

*Balschmiter v. TD Auto Fin. LLC*, No. 13-cv-01186 (E.D. Wis.)

*Barron's Outfitters Inc. v. Deluxe Corp.*, No. 14-cv-01903 (D.S.C.)

*Benzion v. Vivint, Inc.*, No. 12-cv-61826 (S.D. Fla.)

*Berman v. Freedom Fin. Network, LLC*, No. 18-cv-01060 (N.D. Cal.)

*Birchmeier v. Caribbean Cruise Line, Inc.*, No. 12-cv-04069 (N.D. Ill.)

*Biringer v. First Fam. Ins., Inc.*, No. 14-cv-00566 (N.D. Fla.)

*Brieger v. Tellabs, Inc.*, No. 06-cv-1882 (N.D. Ill.)

*Brinker v. Normandin's*, No. 14-cv-03007 (N.D. Cal.)

*Brown v. DIRECTV, LLC*, No. 13-cv-01170 (C.D. Cal.)

*Buchanan v. Sirius XM Radio, Inc.*, No. 17-cv-00728 (N.D. Tex.)

*Caldera v. Am. Med. Collection Agency*, No. 16-cv-00381 (C.D. Cal.)

*Carrese v. Yes Online, Inc.*, No. 16-cv-05301 (C.D. Cal.)

*Carroll v. SGS N. Am., Inc.*, No. 16-cv-00537 (M.D. La.)

*Charvat v FTR Energy Services, LLC*, No. 14-cv-00073 (D. Conn.)

*Charvat v ICOT Hearing Sys., LLC*, No. 17-cv-00245 (S.D. Ga.)

*Charvat v. Nat'l Holdings Corp.*, No. 14-cv-02205 (S.D. Ohio)

*Charvat v. Plymouth Rock Energy, LLC*, No. 15-cv-04106 (E.D.N.Y.)

*Charvat v. Santanna Natural Gas Corp.*, No. 18-cv-02310 (N.D. Ill.)

*Charvat v. The Southard Corp.*, No. 18-cv-00190 (E.D.N.Y.)

*Chinitz v. NRT West, Inc. d/b/a Coldwell Banker Res. Co.*, No. 18-cv-06100  (N.D. Cal.)

*Clough v. Revenue Frontier, LLC*, No. 17-cv-00411 (D. N.H.)

*In re Collecto, Inc., Tel. Consumer Prot. Act (TCPA) Litig.*, No. 14-md-02513 (D. Mass.)

*Cordoba v. DIRECTV, LLC*, No. 15-cv-03755 (N.D. Ga.)

*Cortez v. Nat'l Credit Adjusters, LLC*, No. 17-cv-02152 (S.D. Cal.)

*Davis v. Post University, Inc.*, No. 18-cv-81004 (S.D. Fla.)

*Deforest v. Royal Seas Cruises, Inc.*, No. 17-cv-01988 (S.D. Cal.)

*Dembski v. Dallas Morning News, Inc.*, No. 18-cv-02042 (N.D. Tex.)

*Desai v. ADT Security Services, Inc.*, No. 11-cv-1925 (N.D. Ill.)

*Diaz-Lebel v. TD Bank USA*, No. 17-cv-01611 (D.N.J.)

*Dipuglia v. US Coachways, Inc.*, No. 17-cv-23006 (S.D. Fla.)

*Donaca v. Dish Network, LLC,* No. 11-cv-02910 (D. Colo.)

*Drayton v. Toyota Motor Credit Corp.*, No. 16-cv-00046 (M.D. Fla.)

*Duchene v. Westlake Services, LLC,* No. 13-cv-01577 (W.D. Pa.)

*Edwards v. Conn's, Inc.*, No. 18-cv-01998 (D. Nev.)

*Elias v. Synchrony Bank*, No. 14-cv-08093 (C.D. Cal.)

*Fabricant v. Amerisave Mortgage Corp.*, No. 19-cv-04659 (C.D. Cal.)

*Fanning v. HSBC Card Services, Inc.*, No. 12-cv-00885 (C.D. Cal.)

*Fitzgerald v. Universal Pictures*, No. 16-cv-01193 (M.D. Fla.)

*Fitzhenry v. The ADT Corp. f/k/a ADT Security Services, Inc.*, No. 14-cv-80180 (S.D. Fla.)

*Flowers v. Twilio, Inc.*, No. RG16804363 (Cal. Super. Ct.)

*Fray-Witzer v. Metro. Antiques, LLC*, No. 02-5827 (Mass. Super. Ct.)

*Garcia v. Target Corp.*, No. 16-cv-20727 (S.D. Fla.)

*Gilmore v. USCB Corp.*, No. 17-cv-00119 (M.D. Ga.)

*Goins v. Palmer Recovery Attys., PLLC*, No. 17-cv-00654 (M.D. Fla.)

*Grogan v. Aaron's Inc.*, No. 18-cv-02821 (N.D. Ga.)

*Harrison v. Great Healthworks, Inc.*, No. 17-cv-00705 (S.D. Cal.)

*Heidarpour v. Central Payment Co., LLC*, No. 15-cv-00139 (M.D. Ga.)

*Hennie v. ICOT Hearing Sys., LLC*, No. 18-cv-02045 (N.D. Ga.)

*Hetherington v. Omaha Steaks, Inc.*, No. 13-cv-02152 (D. Or.)

*Hewlett v. Mnet Financial, Inc.*, No. 19-cv-00864 (E.D. Cal.)

*Hirsch v. USHealth Advisors, LLC*, No. 18-cv-0245 (N.D. Tex.)

*Hobbs v. Randall-Reilly, LLC*, No. 19-cv-00009 (M.D. Ga.)

*Hogaboom v. NCO Fin. Sys., Inc.*, No. 15-cv-06146 (E.D. Pa.)

*Hopkins v. Modernize, Inc.*, No. 17-cv-40087 (D. Mass.)

*Horton v. Cavalry Portfolio Services*, *LLC*, No. 13-cv-00307 (S.D. Cal.)

*Hossfeld v. Compass Bank*, No. 16-cv-02017 (N.D. Ala.)

*Hurley v. Messer*, No. 16-cv-09949 (S.D. W.Va.)

*Ikuseghan v. MultiCare Health Sys.*, No. 14-cv-05539 (W.D. Wash.)

*Iverson v. Advanced Disposal Services.*, No. 18-cv-00867 (M.D. Fla.)

*Jenkins v. National Grid USA*, No. 15-cv-01219 (E.D.N.Y.)

*Johansen v. Liberty Mutual Group, Inc.*, No. 15-cv-12920 (D. Mass.)

*Johansen v. Nationwide Mutual Ins. Co.*, No. 16-cv-03634 (N.D. Ga.)

*Johansen v. One Planet Ops, Inc.*, No. 16-cv-00121 (S.D. Ohio)

*Johnson v. Navient Solutions, Inc.*, No. 15-cv-00716 (S.D. Ind.)

*Johnson v. NPAS Solutions, LLC*, No. 17-cv-80393 (S.D. Fla.)

*Kleja v. Transworld Sys., Inc.,* No. 14-cv-00946 (N.D. Cal.)

*Knapper v. Cox Commc'n Inc.*, No. 17-cv-00913 (D. Ariz.)

*Kubacki v. Peapod, LLC*, No. 13-cv-00729 (N.D. Ill.)

*LaVigne v. First Cmty. Bancshares, Inc.*, No. 15-cv-00934 (D. N.M.)

*Leeb v. Charter Commc'n., Inc*, No. 14-cv-02780 (E.D. Mo.)

*Lennartson v. Papa Murphy's Int'l., LLC*, No. 15-cv-05307 (W.D. Wash.)

*Lofton v. Verizon Wireless LLC*, No. 13-cv-05665 (N.D. Cal.)

*Lushe v. Verengo Inc.*, No. 13-cv-07632 (C.D. Cal.)

*Luster v. Green Tree Servicing, LLC*, No. 14-cv-01763 (N.D. Ga.)

*Manopla v. Home Depot USA, Inc.*, No. 15-cv-01120 (D.N.J.)

*Martin v. aaiPharma, Inc.*, No. 04-cv-27 (E.D.N.C.)

*Martin v. Global Tel*Link Corp.*, No. 15-cv-03464 (C.D. Cal.)

*Mauthe v. Versa Cardio*, LLC, No. 15-cv-00657 (M.D. Pa.)

*Mendoza v. Storm Tight Windows of Tex., Inc.*, No. 19-cv-00225 (S.D. Tex.)

*Meredith v. United Collection Bureau, Inc.*, No. 16-cv-01102 (N.D. Ohio)

*Mey v. Direct Energy Services.*, No. 18-cv-182 (N.D. Ohio)

*Mey v. DirecTV, LLC*, No. 17-cv-00179 (N.D. W.Va.)

*Mey v. Frontier Commc'n Corp.*, No. 13-cv-01191 (D. Conn.)

*Mey v. Herbalife Int'l, Inc.*, No. 01-c-263 (W.Va. Cir. Ct.)

*Mey v. Honeywell Int'l, Inc.*, No. 12-cv-01721 (S.D. W.Va.)

*Mey v. Interstate Nat'l Dealer Services, Inc.*, No. 14-cv-01846 (N.D. Ga.)

*Mey v. Matrix Warranty Solutions, Inc.*, No. 21-cv-62 (N.D.W.V.)

*Mey v. Venture Data, LLC*, No. 14-cv-00123 (N.D. W.Va.)

*Mohamed v. Am. Motor Co., LLC*, No. 15-cv-23352 (S.D. Fla.)

*In re Monitronics Int'l, Inc. TCPA Litig.*, No. 13-md-02493 (N.D. W.Va.)

*Morgan v. Florida Hosp.*, No. 18-cv-0142 (M.D. Fla.)

*Morris v. Hornet Corp.*, No. 17-cv-00350 (E.D. Tex.)

*Morris v. SolarCity Corp.*, No. 15-cv-05107 (N.D. Cal.)

*Mulhern v. MacLeod*, 808 N.E.2d 778 (Mass. 2004)

*Naiman v. Total Merch. Services, Inc.*, No. 17-cv-03806 (N.D. Cal.)

*New Concept Dental v. Dental Resource Sys.., Inc.*, No. 17-cv-61411 (S.D. Fla.)

*Newhart v. Quicken Loans, Inc.*, No. 15-cv-81250 (S.D. Fla.)

*Nguyen v. Vantiv, LLC*, No. 15-cv-02436 (N.D. Cal.)

*Ott v. Mortgage Inv. Corp. of Ohio, Inc.*, No. 14-cv-000645 (D. Or.)

*Pieterson v Wells Fargo Bank, N.A.*, No. 17-cv-02306 (N.D. Cal.)

*Reyes v. BCA Fin. Services, Inc.*, No. 16-cv-24077 (S.D. Fla.)

*Rice-Redding v. Nationwide Mutual Ins. Co.*, No. 16-cv-03634 (N.D. Ga.)

*Roberts v. Wyndham Int'l, Inc.*, No. 12-cv-05083 (N.D. Cal.)

*Samson v. United Health Care Services*, No. 19-cv-00175 (W.D. Wash.)

*Sandoe v. Boston Scientific Corp.*, No. 18-cv-11826 (D. Mass.)

*Sapan v. Yelp, Inc.*, No. 17-cv-03240 (N.D. Cal.)

*Saunders v. Cabela's Wholesale, Inc.*, CGC-14-537095 (Cal. Super. Ct.)

*Schaevits v. Braman Hyundai, Inc.*, No. 17-cv-23890 (S.D. Fla.)

*Schaffer v. First Choice Payment Solutions*, No. 18-cv-01981 (C.D. Cal.)

*Sheean v. Convergent Outsourcing, Inc.*, No. 18-cv-11532 (E.D. Mich.)

*Shulruff v. Inter-Med, Inc.*, No. 16-cv-00999 (N.D. Ill.)

*Shuckett v. Dialamerica Marketing Inc.*, No. 17-cv-02073 (S.D. Cal.)

*Sivsubramanian v. DNC Health Corp.*, No. 10-cv-03522 (C.D. Cal.)

*Skulevold v. SD&A Teleservices, Inc.*, No. 20-cv-02771 (C.D. Cal.)

*Slovin v. Sunrun, Inc.*, No. 15-cv-05340 (N.D. Cal.)

*Spaner v. The Coca-Cola Co.*, No. 19-cv-22210 (S.D. Fla.)

*Southwell v. Mortgage Inv. Corp.*, No. 13-cv-01289 (W.D. Wash.)

*St. John v. Keller Williams Realty, Inc.*, No. 19-cv-01347-PGB-DCI (M.D. Fla.)

*Sundermann v. Rohlf*, No. 19-cv-00140 (S.D. Iowa)

*Tannlund v. Real Time Resolutions, Inc.*, No. 14-cv-05149 (N.D. Ill.)

*Thomas v. Fin. Corp. of America*, No. 19-cv-00152 (N.D. Tex.)

*Thomas v Peterson's Harley Davidson of Miami, LLC*, No. 18-cv-61723 (S.D. Fla.)

*Tomeo v. Citigroup Inc.*, No. 13-cv-04046 (N.D. Ill.)

*Tope v. Bankers Life & Cas. Co.*, No. 18-cv-01448 (N.D. Ill.)

*Trenz v. Volkswagen Group of Am.*, No. 15-cv-08356 (C.D. Cal.)

*Vizcarra v. Macys.com Inc.*, No. 14-cv-02041 (C.D. Cal.)

*Walker v. CMRE Financial Services, Inc.*, No. 20-cv-02218-BEN-JLB (S.D. Cal.)

*Warnick v. DISH Network, LLC*, No. 12-cv-01952 (D. Colo.)

*Watson v. Lexus of Manhattan*, No. 20-cv-04572 (S.D.N.Y.)

*West v. Cal. Services Bureau, Inc.*, No. 16-cv-0324 (N.D. Cal.)

*Williams v. PillPack, LLC*, No. 19-cv-05282 (W.D. Wash.)

*Williams v. The Pisa Group, Inc.*, No. 18-cv-04752 (E.D. Pa.)

*Wilson v. Badcock Home Furniture*, No. 17-cv-02739 (M.D. Fla.)

*Winters v. Capital One Bank (USA) N.A.*, No. 17-cv-01178 (C.D. Cal.)

*Wright v. eXp Realty, LLC*, No. 18-cv-01851 (M.D. Fla.)

*Wuest v. MyPillow, Inc.*, No. 18-cv-03658 (N.D. Cal.)

*Zeidel v. Mozeo, LLC*, No. 13-cv-06989 (N.D. Ill.)

**Telephone Consumer Protection Act (TCPA) Notice & Claims Administration Cases**

***Buchanan v. Sirius XM Radio, Inc.*, No. 17-cv-728 (N.D. Tex.).** Ms. Verkhovskaya oversaw the settlement administration for the $25 million TCPA class action settlement, mailing more than 5.8 million postcards, sending more than 41 million emails to potential class members, and processing more than 437,500 claim forms.

*Benzion v. Vivint, Inc.*, No. 12-cv-61826 (S.D. Fla.)

*Brey Corp v. Life Time Improv., Inc.*, No. 11-cv-00948 (D. Md.)

*Brieger v. Tellabs, Inc.*, No. 06-cv-1882 (N.D. Ill.)

*Brown v. Rita's Water Ice Franchise Co., LLC*, No. 15-cv-3509 (E.D. Pa.)

*Collins v. Am. Consumer Shows, Inc.*, No. 10-cv-11912 (D. Mass.)

*Desai v. ADT Security Services, Inc.*, No. 11-cv-1925 (N.D. Ill.)

*Duchene v. Westlake Services, LLC*, No. 13-cv-01577 (W.D. Pa.)

*Fray-Witzer v. Metropolitan Antiques, LLC*, No. 02-5827 (Mass. Super. Ct.)

*Fray-Witzer v. Olde Stone Land Survey Co., Inc.*, No. 08-cv-04175 (Mass. Super. Ct.)

*Heidarpour v. Cent. Payment Co., LLC*, No. 15-cv-00139 (M.D. Ga.)

*Horton v. Cavalry Portfolio Services, LLC*, No. 13-cv-00307 (S.D. Cal.)

*Ikuseghan v. MultiCare Health Sys.*, No. 14-cv-05539 (W.D. Wash.)

*Krakauer v. DISH Network, LLC*, No. 14-cv-00333 (M.D.N.C.)

*LaVigne v. First Cmty. Bancshares, Inc.*, No. 15-cv-00934 (D.N.M.)

*Luster v. Green Tree Servicing, LLC*, No. 14-cv-01763 (N.D. Ga.)

*Mann & Co., PC v. C-Tech Ind., Inc.*, No. 08-cv-11312 (D. Mass.)

*Martin v. Dun & Bradstreet, Inc.*, No. 12-cv-00215 (N.D. Ill.)

*Mey v. Herbalife Int'l, Inc.*, No. 01-C-263 (W.Va. Cir. Ct.)

*Mey v. Interstate Nat'l Dealer Services, Inc.*, No. 14-cv-01846 (N.D. Ga.)

*Mey v. Venture Data, LLC*, No. 14-cv-00123 (N.D. W.Va.)

*Milford & Ford Assoc., Inc. v. Am. Consumer Shows, LLC,* No. 10-cv-11912 (D. Mass.)

*Milford & Ford Assoc., Inc. v. Cell-Tek, LLC*, No. 09-cv-11261 (D. Mass.)

*Mohamed v. Am. Motor Co., LLC,* No. 15-cv-23352 (S.D. Fla.)

*Munday v. Navy Fed. Credit Union,* No. 15-cv-01629 (C.D. Cal.)

*Nguyen v. Vantiv LLC,* No. 15-cv-02436 (N.D. Cal.)

*Ward v. Flagship Credit Acceptance LLC,* No. 17-cv-02069 (E.D. Pa.)

**Employee Retirement Income Security Act (ERISA) Administration Cases**

*In re Affiliated Computer Services ERISA Litig.*, No. 06-cv-1592-M (N.D. Tex.)

*In re AIG ERISA Litig.*, No. 04-cv-9387 (S.D.N.Y.)

*In re Bear Stearns Cos., Inc. ERISA Litig.*, No. 08-MDL-1963 (S.D.N.Y.)

*In re Beazer Homes USA, Inc. ERISA Litig.*, No. 07-cv-00952 (N.D. Ga.)

*In re Calpine Corp. ERISA Litig.*, No. C 03-cv-1685 (N.D. Cal.)

*In re Cardinal Health, Inc. ERISA Litig.*, No. C2-04-643 (S.D. Ohio)

*In re Diebold ERISA Litig.*, No. 06-cv-0170 (N.D. Ohio)

*In re Elec. Data Sys. Corp. ERISA Litig.*, 03-md-1512, 03cv-126 (E.D. Tex.)

*In re Fannie Mae ERISA Litig.*, No. 04-cv-01784 (D.D.C.)

*In re Hartford Fin. Services Grp., Inc. ERISA Litig.*, No. 08-cv- 01708 (D. Conn.)

*In re Fremont Gen. Corp. Litig.*, 07-cv-02693 JHN (C.D. Cal.)

*Griffin v. Flagstar Bancorp, Inc.*, No. 10-cv-10610 (E.D. Mich.)

*Hargrave v. TXU Corp.*, No. 02-cv-2573-K (N.D. Tex.)

*Harris v. First Reg'l Bancorp*, No. 10-cv-7164 (C.D. Cal.)

*Harris v. Koenig*, No. 02-cv-00618 (D.D.C.)

*Herrera v. Wyeth ERISA Litig.*, No. 08 Civ. 04688 (S.D.N.Y.)

*In re ING Grp., N.V. ERISA Litig.*, No. 09-cv-00400-JEC (N.D. Ga.)

*In re JDS Uniphase Corp. ERISA Litig.*, No. C 03-04743 CW (S.D.W.Va.)

*In re Marsh ERISA Litig.*, No. 04-cv-8157 (S.D.N.Y.)

*In re Merck & Co. Inc. Vytorin ERISA Litig.*, No. 08-cv-1974 (D.N.J.)

*In re Nat'l Cty. Corp. Sec., Deriv. & ERISA Litig.*, No. 08-nc-70000 (N.D. Ohio)

*In re PFF Bancorp, Inc. ERISA Litig.*, No. 08-cv-01093 (C.D. Cal.)

*In re R.H. Donnelley Corp. ERISA Litig.*, No. 09-cv-07571 (N.D. Ill.)

*In re RCN Corp. ERISA Litig.*, No. 04-cv-5068 (D.N.J.)

*In re Schering-Plough Corp. Enhance ERISA Litig.*, No. 08-cv-1432 (D.N.J.)

*In re Sears, Roebuck & Co. ERISA Litig.*, No. 02-C-8324 (N.D. Ill.)

*Shane v. Edge*, No. 10-cv-50089 (N.D. Ill.)

*Walter v. Level 3 Commc'n, Inc.*, No. 09-cv-0658-REB-CBS (D. Colo.)

*Yost v. First Horizon*, No. 08-02293 (W.D. Tenn.)

*Young v. Heimbuch*, No. CV10-8914 ODW (C.D. Cal.)

*In re YRC Worldwide, Inc. ERISA Litig.*, No. 09-cv-02953 (D. Kan.)

## Consumer Protection Notice & Claims Administration Cases

*Acevedo v. Lawyers Title Ins. Corp.*, No. 03-CH-07718 (Ill. Cir. Ct.)

*Allen v. HealthPort Tech., LLC*, No. 12-CA-013154 (Fla. Cir. Ct.)

*Alper v. Warnock Ford, Inc.*, No. MRS-L-1644-10 (N.J. Super. Ct.)

*Arias v. Award Homes, Inc.*, No. M54183 (Cal. Super. Ct.)

*Arteaga v. MODA Furniture, Inc.*, No. L-000980-05 (N.J. Super. Ct.)

*Black v. Metso Paper USA, Inc.*, No. 05-cv-1951 (M.D. Pa.)

*Blanco v. KeyBank USA, N.A.*, No. 03-cv-524 (N.D. Ohio)

*Bosland v. Warnock Dodge, Inc.*, No. MRS-L-844-06 (N.J. Super. Ct.)

*Bragg v. Bill Heard Chevrolet, Inc.-Plant City*, No. 02-cv-609-T-30EAJ (M.D. Fla.)

*Brown v. Hayt, Hayt & Landau, LLC*, No. L-7042-07 (N.J. Super. Ct.)

*Brumfield v. Countrywide Home Loans, Inc.*, No. 08-cv-93-HSO-JMR (S.D. Miss.)

*Burns v. First American Bank*, No. 04-cv-7682 (N.D. Ill.)

*Canning v. Concord EFS, Inc.*, No. L-6609-02 (N.J. Super. Ct.)

*Carlson v. State of Alaska, Commercial Fisheries Entry Comm'n*, No. 3AN-845790 CI (Alaska Super. Ct.)

*Cerda v. Associates First Capital Corp.*, No. M-03-146 (S.D. Tex.)

*Clearview Imaging, LLC v. Dairyland Ins.*, No. 04-11399 (Fla. Cir. Ct.)

*Clearview Imaging, LLC v. Mercury Ins. Co. of Fla.*, No. 035170 (Fla. Cir. Ct.)

*Clearview Imaging, LLC v. Nationwide Mutual Ins. Co.*, No. 0410396 (Fla. Cir. Ct.)

*Clearview Imaging, LLC v. Progressive Consumers Ins. Co.*, No. 034174 (Fla. Cir. Ct.)

*Clemons v. Thompson*, No. MON-L-001980-07 (E.D.N.Y.)

*Cohen v. JPMorgan Chase & Co.*, No. 04CV4098 (E.D.N.Y.)

*Coleman v. Lincoln Wood Products, Inc.*, No. 99-cv-1362 (N.J. Super. Ct.)

*Commonwealth of Massachusetts v. H&R Block, Inc.*, No. 08-2474-BLS1 (Mass. Super. Ct.)

*Coppess v. Healthways, Inc.*, No. 10-cv-00109 (M.D. Tenn.)

*Corsello v. Verizon New York, Inc.*, No. 39610/07 (N.Y. Super. Ct.)

*Cotton v. Ferman Mngmt. Services Corp.*, No. 02-cv-08115 (Fla. Cir. Ct.)

*Cottrell v. Gardner*, No. 02-cv-121(I), Super. Fin. Corp. Deriv. Action (Ark.)

*Croxall v. Tampa Hund L.P.*, No. 03-6201 (Fla. Cir. Ct.)

*Cruz v. Condor Capital Corp.*, No. MID-L-2108-06 (N.J. Super. Ct.)

*Curtis v. Northern Life Ins. Co.*, No. 01-2-18578-1 SEA, (Wash. Super. Ct.)

*Di Popolo v. Ramsey Nissan, Inc.*, No. BER-L-10319-09, (N.J. Super. Ct.)

*Dishkin v. Tire Kingdom, Inc.*, No. 08-2088 (Fla. Cir. Ct.)

*Drury v. Countrywide Home Loans, Inc.*, No. 08-cv-152-ORL-28 DAB (M.D. Fla.)

*Eisenberger v. Boston Service Co., Inc.*, No. MID-L-10366-09 (N.J. Super. Ct.)

*Epstein v. Sears, Roebuck and Co.*, No. UNN-L-1732-09 (N.J. Super. Ct.)

*Est. of Gary Robertson v. ADS Alliance Data Sys., Inc.*, No. 11-cv-1652 (M.D. Fla.)

*Est. of Mitchell Hampton v. Beverly Enterprises, Inc.*, No. 2004-95-3 (Ala. Cir. Ct.)

*Estep v. Smythe Volvo, Inc.*, No. UNN-L-004184-03 (N.J. Super. Ct.)

*Evans v. Stewart Title Guaranty Co.*, No. 04-06630-05 (Fla. Cir. Ct.)

*Family Open MRI, Inc. v. Direct Gen. Ins. Co.*, No. 03-4175 (Fla. Cir. Ct.)

*Fernando v. Neopost USA, Inc.*, No. BC439856 (Cal. Super. Ct.)

*Fernando v. Priority Mailing Sys.*, No. BC439857 (Cal. Super. Ct.)

*Ferro v. Florida Windstorm Underwriting Assoc.*, No. 00014808 (Fla. Cir. Ct.)

*Francis v. A&E Stores, Inc.*, No. 06-cv-1638 (S.D.N.Y.)

*Franco v. Ace Parking Management Inc.*, No. BC 392809 (Cal. Super. Ct.)

*Froumy v. Stark & Stark*, No. 09-cv-04890 (D.N.J.)

*FW Transportation, Inc. v. Associates Commercial Corp.*, No. C200000084 (Tex. Cir. Ct.)

*Gilley v. Ernie Haire Ford, Inc.*, No. 02-8101 (Fla. Cir. Ct.)

*Graham v. Town & Country Disposal of Western Missouri, Inc.*, No. 10-cv-00551 (W.D. Mo.)

*Greenstein v. Nations Title Agency of Florida, Inc.*, No. 07-014085 (Fla. Cir. Ct.)

*Gulf Coast Injury Center, LLC v. Nationwide Mutual Fire Ins. Co.*, No. 08-012621 (Fla. Cir. Ct.)

*Hamilton v. ATX Services Inc.*, No. 08-cv-0030 (W.D. Mo.)

*Haynes v. Baptist Health*, 240 S.W.3d 576 (Ark. 2006)

*Hellmers v. Countrywide Home Loans, Inc.*, No. 07-7703 (E.D. La.)

*Hill v. Am. Med. Sec. Life Ins. Co.*, C.A. No. 06-cv-00332 (W.D. Tex.)

*Hill v. Countrywide Home Loans, Inc.*, No. A-0178441 (E.D. Tex.)

*Hudson United Bank v. Chase*, No. L-235-05 (N.J. Super. Ct.)

*Hughley v. Md. Cas. Co.*, No. 06-21428-CIV-ALTONAGA (S.D. Fla.)

*Hutson v. Baptist Health*, No. CV 08-8221 (Ark. Cir. Ct.)

*Hutt v. Martha Stewart Living Omnimedia, Inc.*, N.Y. Slip. Op. 651249/2012 (N.Y. Super. Ct.)

*Kalow & Springut, LLP v. Commence Corp.*, No. 07-3443 (D.N.J.)

*Kay v. Wells Fargo & Co.*, No. 07-cv-01351 (N.D. Ca.)

*Lafayette Life Ins. Co. v. Cty. of Menasha*, No. 09-cv-64TLS-APR (N.D. Ind.)

*Mann v. Lawyers Title Ins. Corp.* No. 03 CH 15223 (Ill. Cir. Ct.)

*Mantzouris v. Scarritt Motor Grp., Inc.*, No. 03-cv-0015-T-30-MSS (M.D. Fla.)

*Martin v. Foster Wheeler Energy Corp.*, No. 06-cv-00878 (C.D. Cal.)

*Mayotte v. Assoc. Bank, N.A.*, No. 07-cv-00033 (N.D. Fla.)

*Meadows v. Clearwater Bay Mktg, LLC*, No. 49C01-0812-PL-054708 (Ind. Cir. Ct.)

*Means v. River Valley Fin. Bank*, No. 49D12-0704-PL016504 (Ind. Super. Ct.)

*Miller v. Weltman, Weinberg & Reis Co.*, L.P.A., No. MID-L-006248-07 (N.J. Super. Ct.)

*Monroy v. Citrus Cnty.*, No. 2004-CA-1840 (Fla. Cir. Ct.)

*Moore v. The Hertz Corp.*, No. 03-11772 (Fla. Cir. Ct.)

Mortgage Settlement Consumer Restit. Prog. (Foreclosure Restit. Prog. and BOA Victims Prog.)

*NSL Capital Mgmt. v. Gorman*, No. C-48-08 (N.J. Super. Ct.)

*Nthenge v. Pressler and Pressler, LLP*, No. C-00-1211-PH (N.D. Cal.)

*Obermeyer v. MarineMax East, Inc.*, No. 08-54007-CA-24 (Fla. Cir. Ct.)

*Olivo v. Homecomings Fin., LLC*, No. 06-4625 (N.Y. Super. Ct.)

*Open MRI of Pinellas, Inc. v. Atlanta Cas. Ins. Co.*, No. 03-7721 (Fla. Cir. Ct.)

*Ori v. Fifth Third Bank and Fiserv, Inc.*, No. 08-cv-00432-LA (E.D. Wis.)

*Ownby v. Citrus Cnty., Florida*, No. 04-CA-1840 (Fla. Cir. Ct.)

*Parker v. Am. Med. Sec. Grp., Inc.*, No. 04-1-1980-42 (Ga. Super. Ct.)

*Parthiban v. GMAC Mortgage Corp.*, SACV05-768-ODW (C.D. Cal.)

*Perez v. Rent-A-Center, Inc.*, No. 01-cv-7593 (N.J. Super. Ct.)

*Pettway v. Harmon Law Offices, P.C.*, No. 03-10932-RGS (D. Mass.)

*Pickett v. Triad Fin. Corp.*, No. MID-L-007727-05 (N.J. Super. Ct.)

*Pollitt v. DRS Towing, LLC*, No. 10-cv-1285 (D.N.J.)

*Premier Open MRI, LLC v. Progressive Am. Ins. Co.*, No. 04-00021 (Fla. Cir. Ct.)

*Puritan Budget Plan, Inc. v. Amstar Ins. Co.*, No. 04-10428 (Fla. Cir. Ct.)

*Ragsdale v. SanSai USA, Inc.*, No. 07-cv-1246 WQH (S.D. Cal.)

*S. Parker Hardware Mfg. Corp. v. AT&T Corp.*, No. BER-L-162-06 (N.J. Super. Ct.)

*Saint Pete MRI v. Auto Club South Ins. Co.*, No. 10-CA-013134 (Fla. Cir. Ct.)

*Saint Pete MRI v. Hartford*, No. 10-03925 (Fla. Cir. Ct.)

*Sam v. White*, No. 49D06-1006-PL-027492 (Ind. Super. Ct.)

*Santos v. Silver*, No. MID-L-08188-07 (N.J. Super. Ct.)

*Scher v. Oxford Health Plans, Inc.*, Am. Arbitration Ass'n, No. 11 193 00548 05

*Sheikh v. Maxon Hyundai, Inc.*, No. L-000476-09 (N.J. Super. Ct.)

*Silke v. Irwin Mortgage Corp.*, No. 49D03-0304-PL-000697 (Ind. Super. Ct.)

*Soden v. East Brunswick Buick*, Nos. L-2510-03, L-5617- 03 (N.J. Super. Ct.)

*Sokoloski v. Stewart Title Guar. Co.*, No. 08-cv-00236-AWT (D. Conn.)

*UltraOpen MRI Corp. v. Hartford Cas. Ins. Co.*, No. 07- CA009132 (Fla. Cir. Ct.)

*UltraOpen MRI Corp. v. Nationwide Assurance Co.*, No. 03-010725 (Fla. Cir. Ct.)

*United Cons. Fin. Ser. v. Carbo,* 982 A.2d 7 (N.J. Super. Ct. App. Div. 2009)

*Valley Nat'l Bank v. Cahn*, No. L-0504-04 (N.J. Super. Ct.)

*Veal v. Crown Auto Dealerships, Inc.*, No. 04-cv-0323-T-27 (M.D. Fla.)

*Walker v. Hill Wallack LLP*, No. MID-L-003480-08 (N.J. Super. Ct.)

*Wells v. DTD Enterprises, Inc.*, No. L-9012-07 (N.J. Super. Ct.)

*Wenger v. Cardo Inc.*, No. MID-L-4924-07 (N.J. Super. Ct.)

*Wenger v. Freehold Subaru, LLC*, No. MON-L-4003-10 (N.J. Super. Ct.)

*Williams v. CBE Grp.*, No. 11-cv-3680-PS (D.N.J.)

*Yarviv v. AT&T Corp.*, No. SOM-L-272-05 (N.J. Super. Ct.)

*Yingling v. eBay, Inc.*, 09-cv-01733 JW (N.D. Cal.)

## Civil Rights Notice & Claims Administration Cases

***Leslie Ann Wilkie Peltier v. Debra Haaland*, No. 1:20-cv-03775-TFH (D.D.C.).** A class action lawsuit to redress alleged breaches of trust by the U.S. Department of the Interior, the U.S. Department of the Treasury, and the U.S. of America with respect to the accounting and management of two Judgment Awards of the Indian Claims Commission. The $59 million settlement provided relief to several generations of tribal families. Ms. Verkhovskaya developed a novel class notification and claims adjudication process that quickly and efficiently distributed settlement funds to surviving tribal members and their heirs. At the preliminary approval hearing, the federal judge overseeing the settlement noted that CEG was "instrumental in helping to shape the deal…"

Class counsel noted that CEG "made extensive efforts to identify and reach" the class and that CEG's class notification efforts "have met or gone beyond the Rule 23 and due process…requirements…" In the order granting final settlement agreement approval, the court noted that CEG's class notification process provided "the best notice practicable under the circumstances…and it was reasonably calculated to reach the class members." As an indication of the notice adequacy and its expansive reach, claimants were reached beyond the USA and claims were filed by class members from six additional countries: Australia, Austria, Canada, The Netherlands, Norway, and South Korea.

**German Forced Labour Compensation Programme (GFLCP).** Ms. Verkhovskaya was appointed by the government of Germany to lead notice and claims collection efforts in the GFLCP. Under Ms. Verkhovskaya's direction, the program located more than 43,000 Romani survivors in 17 countries in central and eastern Europe who were potentially eligible for humanitarian aid. Ms. Verkhovskaya oversaw creation of a comprehensive database for the GFLCP and the Holocaust Victim Assets Programme and coordinated direct assistance with claim completion for more than 11,000 Romanies in eight central and eastern European countries.

*In re Holocaust Victim Assets Litig.*, **105 F. Supp. 2d 139 (E.D.N.Y. 2000).** Ms. Verkhovskaya played a key role in a worldwide Phase I notice program that resulted in the processing of more than 500,000 initial questionnaires relating to a $1.25 billion settlement. In Phase III of that matter, Ms. Verkhovskaya coordinated delivering notice to more than 10,000 Jewish communities in 109 countries. In both Phases I and III of that matter, Ms. Verkhovskaya administered international help and call centers that directly assisted more than 100,000 potential claimants, created a class-appropriate notice targeting members of the Romani community in 48 countries, directed hundreds of staff in communicating with Romani communities and individuals, and notified more than two million people of the settlement.

**International Commission of Holocaust Era Insurance Claims (ICHEC).** Ms. Verkhovskaya was appointed by Chairman Lawrence Eagleburger, former U.S. Secretary of State, to serve as consultant to ICHEIC on notice and outreach strategies and supervised the notification of claimants and face-to-face assistance programs in eastern Europe and the former Soviet Union.

**Project HEART: Holocaust Era Asset Restitution Taskforce.** Ms. Verkhovskaya was appointed by the Israeli government as the administrative director of Project HEART to provide essential tools, strategy, and information to enable Israel and its partners to secure restitution for eligible Jewish Holocaust victims and their heirs. Project HEART was one of the most comprehensive multilingual notice campaigns ever undertaken, covering 137 countries. Ms. Verkhovskaya assisted in launching a multilingual, interactive website, establishing a 24-hour call center in 13 languages, distributing more than 500,000 documents to potentially eligible families of Holocaust victims, handling more than 80,000 telephone calls, conducting archival research, and creating the most comprehensive online database of looted Jewish property in history. Ms. Verkhovskaya oversaw and directed the establishment of the largest and most complex data repository in the world, of nearly two million records identifying Jewish property stolen or looted during the Holocaust. In addition, under Ms. Verkhovskaya supervision, Project HEART reached out to 15,000 non-governmental organizations (NGOs) to engage them in the project and provide personal assistance to thousands of Holocaust victims and their heirs in making their claims.

*In re Assicurazioni Generali S.p.A. Holocaust Ins. Litig.,* 228 F.Supp.2d 348 (S.D.N.Y.)

*Austrian Banks Holocaust Litig.*, Nos. 01-3017, 01-3019, 01-3024, 01-3025 (S.D.N.Y.)

*Flood v. Dominguez*, No. 08-cv-153 (N.D. Ind.)


### U.S. Securities and Exchange Commission Fairness Actions Notice & Claims Administration Cases

*In re Morgan Asset Mgmt., Inc.*, SEC Admin. Proceeding File No. 3-13847

*SEC v. Anderson*, No. 05-1128 (D. Minn.)

*SEC v. The BISYS Grp., Inc.*, No. 07-cv-04010-KMK (S.D.N.Y.)

*SEC v. Gen-See Capital Corp.*, No. 09-cv-00014S (W.D.N.Y.)

*SEC v. RenaissanceRe Holdings Ltd.*, No. 07-cv-00865 RWS (S.D.N.Y.)

*SEC v. Rockford Funding Grp.*, No. 09-cv-10047-PGG (S.D.N.Y.)

*SEC v. Take-Two Interactive Software, Inc.*, No. 09-cv-03113 (S.D.N.Y.)

*SEC v. Tecumseh Holdings Corp.*, 765 F. Supp. 2d 340 (S.D.N.Y.)

*SEC v. Value Line, Inc.*, SEC Admin. Proceeding File No. 3-13675

*SEC v. WexTrust Capital, LLC*, No. 08-cv-7104 (S.D.N.Y.)

*SEC v. Zomax, Inc.*, No. 04-1155 (D. Minn.)


## Antitrust Notice & Claims Administration Cases

*Ace Marine Rigging & Supply, Inc. v. Virgnia Harbor Svcs., Inc.*, No. 11-cv-00436 (C.D. Cal.)

*Bd. of Commr.'s of Port of New Orleans v. Virginia Harbor Svcs. Inc.*, No. 11-cv-00437 (C.D. Cal.)

*In re DDAVP Indirect Purchaser Antitrust Litig.*, No. 05-2237 (S.D.N.Y.)

*In re Iowa Ready-Mixed Concrete Antitrust Litig.*, No. 10-004038-MWB (N.D. Iowa)

*In re Marine Hose Antitrust Litig.*, No. 08-1888 (S.D. Fla.)

*In re Platinum and Palladium Commodities Litig.*, No. Civ 3617-WHP (S.D.N.Y.)

*In re Potash Antitrust Litig. (II)*, No. 08-6910 (N.D. Ill.)

*In re Ready-Mixed Concrete Antitrust Litig.*, No. 05-cv-00979-SEB-VSS (S.D. Ind.)


## Securities Fraud Notice & Claims Administration Cases

*In re ACS S'holders Litig.*, No. 06-cv-1592-M (N.D. Tex.)

*In re Adolor Corp. S'holders Litig.*, No. 6997-VCN (Del. Ch.)

*In re AirGate PCS, Inc. Sec. Litig.*, No. 02-cv-1291-JOF (N.D. Ga.)

*In re Am. Italian Pasta Co. Sec. Litig.*, No. 05-cv-0725-W-ODS (W.D. Mo.)

*In re Andrx Corp.*, 296 F.Supp.2d 1356 (S.D. Fla.)

*In re Atlas Energy, Inc. S'holders Litig.*, No. 5990-VCL (Del. Ch.)

*Bauman v. Super. Fin. Corp.*, No. 01-cv-00756 GH (E.D. Ark.)

*In re Beckman Coulter, Inc. Sec. Litig.*, No. 10-cv-1327-JST (C.D. Cal.)

*In re BigBand Networks, Inc. Sec. Litig.*, No. 07-cv-5101 (N.D. Cal.)

*In re BISYS Sec. Litig.*, No. 04-cv-3840 (JSR) (S.D.N.Y.)

*In re BP Prudhoe Bay Royalty Trust Sec. Litig.*, No. C06-1505 (W.D. Wash.)

*Capovilla v. Lone Star Tech., Inc.*, No. 07-02979 (Tex. Dist. Ct.)

*In re Cbeyond, Inc. Sec. Litig.*, No. 08-cv-1666 (CC) (N.D. Ga.)

*Cement Masons & Plasterers Joint Pension Trust v. TNS, Inc.*, No. 06-cv-363 (E.D. Va.)

*In re CNX Gas Corp. S'holders Litig.*, No. 5377-VCL (Del. Ch.)

*In re Connetics Sec. Litig.*, No. C 07-02940 SI (N.D. Cal.)

*In re CP Ships Ltd. Sec. Litig.*, No. 05-md-1656-T-27TBM (M.D. Fla.)

*Dandong v. Pinnacle Performance Ltd.*, No. 10-cv-8086 (S.D.N.Y.)

*DeCario v. Lerner N. Y., Inc.*, No. BC 317954 (Cal. Super. Ct.)

*In re Del Monte Foods Co. S'holder Litig.*, No. 6027- VCL (Del. Ch.)

*In re Delphi Fin. Grp. S'holders Litig.*, No. 7144-VCG (Del. Ch.)

*In re Dura Pharm., Inc. Sec. Litig.*, No. 99-cv-0151-JLS (WMC) (S.D. Cal.)

*In re Emergent Grp., Inc. S'holder Litig.*, No. BC455715 (Cal. Super. Ct.)

*Friedman v. Rayovac Corp.*, No. 02-cv-0308-C (W.D. Wis.)

*Friewalde v. Boeing Aero. Operations, Inc.*, No. 06-Vcv-236 (W.D. Tex.)

*In re Gen. Electric Co. Sec. Litig.*, No. 09-cv-1951 (DLC) (S.D.N.Y.)

*In re Gilead Sci. Sec. Litig.*, No. C-03-4999-SI (N.D. Cal.)

*In re Goodrich S'holders Litig.*, No. 11-13699 (N.Y. Super. Ct.)

*Groen v. PolyMedica Corp.*, No. 07-3352 (Mass. Super. Ct.)

*Hall v. The Children's Place Retail Stores, Inc.*, No. 07-cv-08252-SAS (S.D.N.Y.)

*In re Hearst-Argyle S'holder Litig.*, No. 09-cv-600926 (N.Y. Super. Ct.)

*Hess v. Oriole Homes Corp.*, No. 07-7703 (Fla. Cir. Ct.)

*Holley v. Kitty Hawk, Inc.*, No. 00-cv-0828-P (N.D. Tex.)

*In re IBM Corp. Sec. Litig.*, No. 05-cv-6279 (S.D.N.Y.)

*In re ICG Commc'n, Inc. Sec. Litig.*, No. 00-cv-1864-REBBNB (D. Colo.)

*In re InfoSonics Sec. Litig.*, No. 06-cv-1231-JLS (S.D. Cal.)

*In re J. Crew Grp., Inc. S'holders Litig.*, No. 6043-CS (Del. Ch.)

*Kellman v. Forever 21 Retail, Inc.*, No. 12-32841 CA 05 (Fla. Cir. Ct.)

*In re King Pharm., Inc. Sec. Litig.*, No. 03-cv-77 (E.D. Tenn.)

*Kubota v. Walker*, No. 06-02446 (Tex. Dist. Ct.)

*In re LDK Solar Sec. Litig.*, No. C 07-05182 WHA (N.D. Cal.)

*In re Lehman Bros. Equity/Debt Sec. Litig.*, No. 09-md-2017 (S.D.N.Y.)

*Lehmann v. Ivivi Tech., Inc.*, No. C-343-09 (N.J. Super. Ct.)

*In re Lernout & Hauspie Sec. Litig.,* Nos. 00-cv-11589, 04-cv-1738 (D. Mass.)

*In re Limelight Networks, Inc. Sec. Litig.*, No. CV07-01603 (D. Ariz.)

*Long v. Eschelon Telecom, Inc.*, No. 27-cv-07-6687 (Minn. Dist. Ct.)

*La. Mun. Police Employees Ret. Sys. v. Deloitte & Touche LLP*, No. 04-621 (E.D.N.Y.)

*In re Martek Biosciences Corp. Sec. Litig.*, No. MJG 05-1224 (D. Md.)

*In re Massey Energy Co. Sec. Litig.*, No. 10-cv-00689-ICB (N.D. Cal.)

*In re MBNA Corp. Sec. Litig.*, No. 05-cv-00272-GMS (D. Del.)

*In re Metavante Tech., Inc. S'holder Litig.*, No. 09-CV5325 (Wis. Cir. Ct.)

*In re Micromuse, Inc. Sec. Litig.*, No. C-04-0136 BZ (N.D. Cal.)

*In re MK Res. Co. S'holders Litig.*, Nos. 1692-VCS, 1598VCS (Del. Ch.)

*Montalvo v. Tripos, Inc.*, No. 03-cv-995SNL (E.D. Mo.)

*In re Motive, Inc. Sec. Litig.*, Nos. A-05-cv-923-LY, A06-CA-017-LY (W.D. Tex.)

*Mozenter v. Nalco Holding Co.*, No. 11-MR-001043 (Ill. Cir. Ct.)

*In re Novamed, Inc. S'holders Litig.*, No. 6151-VCP (Del. Ch.)

*In re NX Networks Sec. Litig.*, Nos. 00-cv-11850-JLT, 01- CV10377-JLT (D. Mass.)

*In re OSI Pharm., Inc. Sec. Litig.*, No. 04-cv-05505- JSWDW (E.D.N.Y.)

*In re Pacific Gateway Exch., Inc. Sec. Litig.*, No. 00-cv-1211 (N.D. Cal.)

*In re Par Pharm. Cos., Inc. S'holders Litig.*, No. 7715(VCP)  (Del.  Ch.)

*In  re  Par  Pharm.  Sec.  Litig.*,  No.  06-cv-03226  (D.N.J.)

*Paskowitz v. Ernst & Young, LLP*, No. A-08-CA-188-LY (W.D. Tex.)

*Pension Tr. Fund for Operating Eng'rs v. Assisted Living,* 943 F. Supp. 2d 913 (E.D. Wis.)

*Police & Fire Ret. Sys. of the Cty. of Detroit v. SafeNet, Inc*., No. 06-cv-05797 (S.D.N.Y.)

*Provo v. China Organic Ag., Inc.*, No. 08-cv-1081 (S.D.N.Y.)

*Quaak v. Dexia, S.A.*, No. 03-cv-11566 (D. Mass.)

*Raspante v. Harris Interactive*, No. 9148-VCP (Del. Ch.)

*Raul v. Western Liberty Bancorp*, No. A-12-668865-B (Nev. Dist. Ct.)

*In re Reliant Sec. Litig.*, No. H-02-1810 (S.D. Tex.)

*In re RenaissanceRe Holdings Ltd. Sec. Litig.*, No. 05-cv-06764-WHP (S.D.N.Y.)

*Rubin v. MF Global, Ltd.*, No. 08-cv-2233 (S.D.N.Y.)

*In re Scottish Re Grp. Sec. Litig.*, No. 06-cv-5853 (S.D.N.Y.)

*Serino v. Kenneth Lipper, et. al.*, No. 04/602106 (N.Y. Super. Ct.)

*In re Sexy Hair Concepts, LLC*, No. 10-bk-25919-GM (Bankr. C.D. Cal.)

*In re SFBC Intern'l Sec. & Deriv. Litig.*, No. 06-cv-000165-SRC (D.N.J.)

*In re SLM Corp. Sec. Litig.*, No. 08-cv-1029 (S.D.N.Y.)

*In re Supervalu, Inc. Sec. Litig.*, No. 02-cv-1738 (D. Minn.)

*In re Suprema Specialties, Inc. Sec. Litig.*, No. 02-168 (D.N.J.)

*In re Symbol Tech., Inc. Sec. Litig.*, No. 02-cv-1383 (E.D.N.Y.)

*In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247 (S.D.N.Y.)

*Taylor v. McKelvey (Monster Worldwide, Inc.)*, No. 06-cv-8322 (S.D.N.Y.)

*In re TD Banknorth S'holders Litig.*, No. 2557-VCL (Del. Ch.)

*In re Ticketmaster Ent. S'holder Litig.*, No. BC407677 (Cal. Super. Ct.)

*In re Tyson Foods, Inc. Sec. Litig.*, No. 01-425-SLR (D. Del.)

*Valuepoint Partners, Inc. v. ICN Pharm., Inc.*, No. 03-cv-989 DOC (C.D. Cal.)

*In re Vaso Active Pharm. Deriv. Litig.*, Nos. 04-10792, 04-10708 (D. Mass.)

*In re Viisage Tech., Inc. Sec. Litig.*, No. 05-cv-10438-MLW (D. Mass.)

*In re VisionAmerica, Inc. Sec. Litig.*, No. 00-0279 (M.D. Tenn.)

*In re Vonage IPO Sec. Litig.*, No. 07-cv-177 (D.N.J.)

*In re Warner Chilcott Ltd. Sec. Litig.*, No. 06-cv-11515 (S.D.N.Y.)

*Zametkin v. Fid. Mgmt. & Research Co.*, No. 08-cv-10960 (D. Mass.)

*In re Zomax, Inc. Sec. Litig.*, No. 05-cv-01128 (D. Minn.)

**Other Notice & Claims Administration Cases**

*Akins v. Worley Catastrophe Response, LLC*, 921 F. Supp. 2d 593 (E.D. La. 2013)

*Alakayak v. All Alaskan Seafoods, Inc.*, No. 3AN-95-4676 CIV (Alaska Super. Ct.)

*Baptista v. Mut. of Omaha Ins. Co.*, No. 10-467 ML (D.R.I.)

*Brattain v. Richmond State Hosp.*, No. 49D11-0108-CP-1309 (Ind. Super. Ct.)

*Carlson v. C.H. Robinson Worldwide, Inc.*, No. 02-cv-3780 (D. Minn.)

*Chao v. Slutsky*, No. 01-cv-7593 (E.D.N.Y.)

*Clayton v. Velociti, Inc.*, No. 08-cv-2298-CM/GLZ (D. Kan.)

*In re Consumers Trust*, No. 05–60155 (REG) (S.D.N.Y.)

*In re Enter. Rent-A-Car Wage & Hour Emp't Practices Litig.,* No. 2056 (W.D. Pa.)

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*, No. 02-cv-3400 (S.D.N.Y.)

*Johansen v. Liberty Mut. Grp. Inc.,* No. 15-cv-12920-ADB (D. Mass.)

*Kreher v. Cty. of Atlanta, Ga.*, No. 04-cv-2651 (N.D. Ga.)

*Mayer v. Smurfit-Stone Container Corp Ret. Plans Admin. Comm.*, No. 09-cv-02984 (N.D. Ill.)

*Mayes v. The Geo Grp., Inc.*, No. 08-cv-248/RS/EMT (N.D. Fla.)

*Merrimon v. UNUM Life Ins. Co. of Am.*, No. 10-cv-00447-NT (D. Me.)

*Morrison v. MoneyGram Int'l, Inc.*, No. 08-cv-01121 (D. Minn.)

*N.Y. v. SKS Assoc., LLC*, No. 400908/12 (N.Y. Super. Ct.)

*Norflet v. John Hancock Life Ins. Co.*, No. 04-cv-1099 (D. Conn.)

*In re Ortiz v. Aurora Health Care, Inc.*, No. 12-cv-00295-LA (E.D. Wis.)

*Osborn v. EMC Corp.*, No. C 04-00336 JSW (N.D. Cal.)

*Otte v. Life Ins. Co. of N. Am.*, No. 09-cv-11537 (D.N.H.)

*Overby v. Tyco Int'l Ltd.*, No. 02-cv-1357-B (D.N.H.)

*Paliotto v. Johnny Rockets Grp., Inc.*, 06-cv-02253-RCL (D.D.C.)

*Patel v. Baluchi's Indian Rest.*, No. 08-cv-9985 (S.D.N.Y.)

*Payson v. Cap. One Home Loans, LLC*, No. 07-cv-2282 (D. Kan.)

*Pereira v. Foot Locker, Inc.*, No. 07-cv-2157 (E.D. Pa.)

*Ramirez v. GreenPoint Mortgage Funding, Inc.*, No. 08-cv-00369 (N.D. Cal.)

*In re RBC Dain Rauscher Overtime Litig.*, No. 06-cv-03093 (D. Minn.)

*Schmitz v. Liberty Mut. Ins. Co.*, No. 08-cv-02945 (S.D. Tex.)

## WORK HISTORY

**Class Experts Group, LLC**

President and Chief Executive Officer                                    2017-present

Established as a boutique firm with a worldwide presence, Class Experts Group, LLC (CEG) offers a comprehensive range of services tailored to complex litigation support services, including data analysis, expert witness testimony, and class action notice and settlement administration.

**Friends of Be an Angel, Inc.**

Director of the Board                                    2022-present

Friends of Be an Angel is a 501(c)(3) charity dedicated to supporting Ukrainian refugees and internally displaced persons. They provide large-scale humanitarian aid, medical evacuations, mental health programs, and supplies. The organization also focuses on rehabilitation for wounded veterans and rare disease treatment for children. Additionally, they facilitate sister city programs to promote international cooperation and reconstruction efforts.

**Be an Angel e.V.**

Member of the Board                                    2022-present

Be an Angel e.V. is an international charity that began in Berlin, Germany during the 2015 migrant crisis, providing housing for homeless refugees. The organization now offers crisis relief, rescue operations, advocacy, and support for refugees worldwide. Their services include humanitarian aid, medical evacuations for children with rare diseases, and sustainable integration programs. Be an Angel operates in various regions, including Europe, the Middle East, and North America, aiming to deliver comprehensive assistance and empowerment to refugees and asylum seekers.

**Rule of law Empowerment Association (ROLE)**

Member of the Board                                    2022-present

ROLE is a dynamic human rights NGO founded in Strasbourg, France by former judges of the European Court of Human Rights (ECtHR), legal experts, renowned European and U.S. lawyers, and passionate young legal professionals dedicated to advancing human rights and the rule of law across Europe and Central Asia.

**DRRT**

Managing Director                                    2016-2017

DRRT is an international law firm specializing in global securities litigation, institutional claims filing, and litigation support. They assist institutional investors with loss recovery through litigation, arbitration, and claims in global settlements. DRRT operates from offices in Miami, Frankfurt, Paris, and London, and emphasizes client-focused services in investor loss recovery and corporate governance. They handle significant securities litigation cases and settlements worldwide, offering a comprehensive approach to legal claims and recovery.

**A.B. Data, Ltd.**

Partner and Chief Operating Officer, Class Action Administration                                    1999-2016

Ms. Verkhovskaya founded and led A.B. Data, Ltd. to become a nationally recognized class action administration firm. A.B. Data provides comprehensive class action administration services, including notice administration, claims processing, media services, contact centers, case websites, and settlement fund distribution.

Ms. Verkhovskaya was a leader in class action claims fraud detection. She formed the Fraud Prevention and Detection Task Force in collaboration with Duke Law School, the Federal Bureau of Investigations, the U.S. Secret Service, the IRS Criminal Investigative Division, the United States Postal Services, the Department of Justice, and other government organizations, developing class action industry guidelines on preventing fraud.

## EDUCATION

Executive Master of Business Administration
Brown University & IE Business School

Course Certificate, Data Science, Machine Learning and AI for Business
Course Certificate, Leadership in Times of Volatility and Uncertainty
Brown University & IE Business School

Bachelor of Science
Molloy University

— **EXHIBIT  3** —

<u>Verkhovskaya Expert Testimony at Deposition, Hearing or Trial (Past Four Years)</u>

*Ahmad v. Fathom Realty FL LLC*, No. 24-cv-61491 (S.D. Fla.)

*Bilek v. National Congress of Employers, Inc., et al.*, No. 18-cv-03083 (N.D. Ill.)

*Brown v. DirecTV, LLC*, No. 13-cv-01170 (C.D. Cal.)

*Bumpus v. Realogy Holdings Corp.*, No. 19-cv-03309 (N.D. Cal.)

*Calhoun v. Invention Submission Corp.*, No. 18-1022 (W.D. Pa.)

*Clark v. Via Renewables, Inc. f/k/a Spark Energy*, Case No. 24-568 (N.D. Cal.)

*Davis v. Capital One, N.A.*, No. 22-00903 (E.D. Va.)

*Elliot v. Humana, Inc.,* No. 3:22-cv-00329 (W.D. Ky.)

*Galloway v. Valve Corp.*, No. 16-1941 (W.D. Wash.)

*Gruber v. Yelp, Inc*., No. 16-cv-554784 (Sup. Ct. California, SF)

*Jackson v. Athena Bitcoin, Inc.*, No.24-00331 (N.D. Fla.)

*Jancik v. WebMD LLC*, No. 22-cv-644 (N.D. Ga.)

*Johnson v. Comodo Group, Inc.*, No. 16-cv-04469 (D.N.J.)

*Mantha v. Quotewizard.com, LLC*, No. 19-cv-12235 (D. Mass)

*Mey v. Matrix Warranty Solutions, Inc.*, No. 21-cv-62 (N.D. Va.)

*Mitchell v. Toyota of Dallas,* No. 23-cv-01278 (N.D. Tex.)

*Sapan v. The Federal Savings Bank*, 23-cv-00075 (C.D. Cal.)

*Sapan v. Lending Tree, LLC*, 23-cv-00071 (C.D. Cal.)

*Starling v. KeyCity Capital, LLC,* No. 21-cv-818 (N.D. Tex.)

*Vance v. DirecTV*, No. 17-cv-00179 (N.D. W.V.)

*Walker v. CMRE Fin. Services, Inc.*, No. 20-cv-02218 (S.D. Cal.)

*Watson v. Lexus of Manhattan*, No. 20-cv-04572 (S.D.N.Y.)

*Williams v. The Pisa Group, Inc.,* No. 18-cv-04752 (E.D. Pa.)

# — EXHIBIT  4 —

## Native file provided on flash drive

## Filed Under Seal

— **EXHIBIT  5** —

**Filed Under Seal**

# — EXHIBIT  6 —

## Native file provided on flash drive

### Filed Under Seal

# — EXHIBIT  7 —

## Native file provided on flash drive

## Filed Under Seal

# — EXHIBIT 8 —

## Native file provided on flash drive

## Filed Under Seal

# — EXHIBIT  9 —

## Native file provided on flash drive

### Filed Under Seal

# — EXHIBIT  10 —

**Filed Under Seal**

# — EXHIBIT  11 —

## Native file provided on flash drive

### Filed Under Seal

# — EXHIBIT  12 —

## Native file provided on flash drive

### Filed Under Seal

# — EXHIBIT  13 —

## Native file provided on flash drive

### Filed Under Seal

# — EXHIBIT  14A —

## Native file provided on flash drive

### Filed Under Seal

# — EXHIBIT  14B —

## Native file provided on flash drive

### Filed Under Seal

# — EXHIBIT  15 —

## Native file provided on flash drive

### Filed Under Seal

# — EXHIBIT  16A —

## Native file provided on flash drive

### Filed Under Seal

# — EXHIBIT  16B —

## Native file provided on flash drive

### Filed Under Seal

# — EXHIBIT  17 —

## Native file provided on flash drive

### Filed Under Seal

# — EXHIBIT  18A —

## Native file provided on flash drive

## Filed Under Seal

# — EXHIBIT  18B —

## Native file provided on flash drive

### Filed Under Seal

# — EXHIBIT  19 —

# Native file provided on flash drive

# Filed Under Seal

# — EXHIBIT  20 —

**Filed Under Seal**

# — EXHIBIT 21 —

## Native file provided on flash drive

### Filed Under Seal

# — EXHIBIT  22 —

# Native file provided on flash drive

**Filed Under Seal**

# — EXHIBIT  23 —

## Native file provided on flash drive

### Filed Under Seal